COPY

FILED

MICHAEL N. FEUER (SBN 111529)
CITY ATTORNEY
CITY OF LOS ANGELES
200 N. Main Street, Room 800
Los Angeles, CA 90012
Telephone: (213) 978-8100
Email: Mike.feuer@lacity.org

2013 DEC -5  PM 4: 09

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

STEVE W. BERMAN (*pro hac vice* pending)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Email: steve@hbsslaw.com

ELAINE T. BYSZEWSKI (SBN 222304)
LEE M. GORDON (SBN 174168)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
Email: elaine@hbsslaw.com
Email: lee@hbsslaw.com

[Additional Counsel Listed on Signature Page]

*Attorneys for Plaintiff the City of Los Angeles*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CITY OF LOS ANGELES, a municipal corporation,

Plaintiff,

v.

CITIGROUP INC.; CITIBANK, N.A.; CITIMORTGAGE, INC; CITICORP TRUST BANK, FSB; and CITI HOLDINGS, INC.,

Defendants.

Case No. CV13-09009-SVW(JCx)

**COMPLAINT FOR VIOLATION OF THE FEDERAL FAIR HOUSING ACT**

**DEMAND FOR JURY TRIAL**

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12 658984 V2

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ................................................................ 1

   A.  Citigroup Inc. Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Los Angeles Resulting in Foreclosures ... 1

II.  PARTIES .................................................................................... 9

III.  JURISDICTION AND VENUE ......................................................... 11

IV.  FACTUAL BACKGROUND ............................................................ 11

V.  CITI ENGAGED IN DISCRIMINATORY LENDING PRACTICES ............................................................................. 15

   A.  Citi's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act ............................................. 15

      1.  Discriminatory lending results in a disproportionate number of foreclosures in minority areas ............................................ 15

      2.  Minority neighborhoods are disproportionate recipients of predatory loans ............................................................ 16

   B.  Citi Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act, as Demonstrated by Former Bank Employees .................................................................. 21

      1.  Citi targets minorities for predatory loan terms. .................. 24

      2.  Citi gives its employees discretion to steer people who qualify for prime mortgages into discriminatory mortgages (and pays its employees more for doing so). .......................................... 26

      3.  Citi limits the ability of minority customers to refinance out of the same predatory loans that they previously received from the Bank. ........................................................................ 26

      4.  Citi engages in other abusive lending practices. .................. 28

   C.  Minorities in Fact Receive Predatory Loan Terms from Citi ................. 30

   D.  Minorities in Los Angeles Receive Such Predatory Loan Terms from Citi Regardless of Creditworthiness ........................................ 31

   E.  Citi's Targeting of Minorities who in Fact Receive Predatory Loan Terms Regardless of Creditworthiness Causes Foreclosures ................ 34

      1.  Data shows that Citi's foreclosures are disproportionately located in minority neighborhoods in Los Angeles. .......................... 34

2.  Data shows that Citi's loans to minorities result in especially quick foreclosures. ................................................................ 36

3.  Data shows that the discriminatory loan terms cause the foreclosures. .................................................................................. 37

VI.  INJURY TO LOS ANGELES CAUSED BY CITI'S DISCRIMINATORY LOAN PRACTICES ........................................... 39

A.  Los Angeles Has Been Injured by a Reduction in Property Tax Revenues from Foreclosures Caused by Discriminatory Loans Issued by Citi .............................................................................................. 40

1.  The decreased value of the properties foreclosed by Citi result in reduced property tax revenues. ............................................. 41

2.  The decreased value of properties in the neighborhoods surrounding foreclosed properties results in reduced property tax revenues. ................................................................................... 41

B.  Los Angeles Is Injured Because It Still Must Provide Costly Municipal Services for Properties in Minority Neighborhoods that Have Become Vacant as a Direct Result of Discriminatory Loans Originated or Purchased by Citi ....................................................................... 43

VII.  SAMPLE FORECLOSURE PROPERTIES  IN THE CITY OF LOS ANGELES ........................................................................ 45

VIII.  STATUTE OF LIMITATIONS AND CONTINUING VIOLATIONS DOCTRINE ................................................................. 45

IX.  CLAIMS FOR RELIEF ................................................................. 46

FIRST CLAIM FOR RELIEF  (Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*) ..................................................... 46

SECOND CLAIM FOR RELIEF  (Common Law Claim For Restitution Based On California Law) .................................................. 48

DEMAND FOR JURY TRIAL ................................................................ 49

PRAYER FOR RELIEF .......................................................................... 49

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12  658984 V2

# I.   NATURE OF THE ACTION

1.     It is axiomatic that banks should not make discriminatory loans.  Banks must extend credit to minorities on equal terms as they do to other similarly situated borrowers.  Banks should not target minority neighborhoods for loans that discriminate nor make loans to minorities on terms that are worse than those offered to whites with similar credit characteristics.  When banks engage in such discriminatory conduct, the misconduct has profound financial consequences for the cities in which mortgaged properties exist, and banks should be responsible for those financial consequences.  Banks should reimburse such cities for lost tax revenues due to discriminatory lending.  And banks should pay the costs of repairing and maintaining properties that go into foreclosure due to discriminatory lending.  This lawsuit arises because Citigroup breached these legally, mandated obligations, and foreseeably injured the City of Los Angeles.

## A.   Citigroup Inc. Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Los Angeles Resulting in Foreclosures

2.     This suit is brought pursuant to the Fair Housing Act of 1968 ("FHA"), as amended, 42 U.S.C. §§ 3601, *et seq.*, by the City of Los Angeles ("Los Angeles" or "City") to seek redress for injuries caused by Citigroup Inc.'s[1] ("Citi" or "the Bank") pattern or practice of illegal and discriminatory mortgage lending.  Specifically, Los Angeles seeks injunctive relief and damages for the injuries caused by foreclosures on Citi's loans in minority neighborhoods and to minority borrowers that are the result of Citi's unlawful and discriminatory lending practices.  The unlawful conduct alleged herein consists of both intentional discrimination and disparate impact discrimination.

---

[1] Defendants collectively are referred to as "Citi," including:  CitiGroup Inc., CitiBank, N.A., CitiMortgage, Inc., CitiCorp Trust Bank, FSB. Citi Holdings, Inc. Plaintiff alleges that Defendants are also liable for residential home loans and lending operations acquired from, and/or sold by or through, ABN Amro Mortgage Group, Inc., Ameriquest Mortgage Company, Argent Mortgage Company, Argent Mortgage Company LLC, and Olympus Mortgage Company.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12  658984 V2

3.    Citi has engaged in a continuous pattern and practice of mortgage discrimination in Los Angeles since at least 2004 by imposing different terms or conditions on a discriminatory and legally prohibited basis.  In order to maximize profits at the expense of the City of Los Angeles and minority borrowers, Citi adapted its unlawful discrimination to changing market conditions.  This unlawful pattern and practice is continuing through the present and has not terminated.  Therefore, the operative statute of limitations governing actions brought pursuant to the Federal Fair Housing Act has not commenced to run.

4.    The pattern and practice of lending discrimination engaged in by Citi consists of traditional redlining[2] and reverse redlining,[3] both of which have been deemed to violate the FHA by federal courts throughout the country.  Citi engaged in redlining, and continues to engage in said conduct, by refusing to extend mortgage credit to minority borrowers in Los Angeles on equal terms as offered to non-minority borrowers.  Citi engaged in reverse redlining, and continues to engage in said conduct, by extending mortgage credit on predatory terms to minority borrowers in minority neighborhoods in Los Angeles on the basis of the race or ethnicity of its residents.  Federal Reserve Chairman Ben Bernanke recently acknowledged these twin evils of mortgage discrimination, and explained that both types of mortgage discrimination "continue to have particular significance to mortgage markets."[4]

5.    Major banks such as Citi have a long history of engaging in redlining throughout Los Angeles.  That practice began to change in the late 1990s, when Citi adapted to changing market conditions, and began to flood historically underserved

---

[2] Redlining is the practice of denying credit to particular neighborhoods based on race.

[3] Reverse redlining is the practice of flooding a minority community with exploitative loan products.

[4] Remarks by Federal Reserve Chairman Ben Bernanke at the Operation HOPE Global Financial Dignity Summit, Atlanta, Georgia at pg. 10 (November 15, 2012) *available at* www.federalreserve.gov/newsevents/speech/bernanke20121115a.htm.

- 2 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12 658984 V2

minority communities with mortgage loans that consisted of a variety of high cost and abusive mortgage loan products with predatory terms, when compared to the mortgage loans issued to white borrowers (reverse redlining).

6.     Citi's discriminatory lending practices have the purpose and effect of placing vulnerable, underserved borrowers in loans they cannot afford.  Reverse redlining maximizes Citi's profit without regard to the borrower's best interest, the borrower's ability to repay, or the financial health of underserved minority neighborhoods.  Moreover, Citi has averted any significant risk to itself by selling the vast majority of mortgage loans it originates or purchases on the secondary market (collectively "Citi Loans").

7.     Between 1996-2006, one category of discriminatory loan products – subprime loans – grew throughout the country from $97 billion to $640 billion.  These loans were frequently targeted to minorities.  Upon information and belief, the lack of accessible credit resulting from Citi's previous pattern and practice of redlining in the minority communities in Los Angeles created conditions whereby the Bank could easily target and exploit underserved minority communities which, due to traditional redlining, had been denied credit.

8.     Thereafter, following several years of issuing abusive, subprime mortgage loans throughout the minority communities of Los Angeles, commencing in or around 2007, Citi once again adapted to changing market conditions, while continuing its pattern and practice of issuing a variety of discriminatory loan products.  Simultaneously, Citi also decided to curtail the issuance of mortgage credit to minority borrowers in Los Angeles.[5]  In other words, Citi not only refused to extend credit to minority borrowers when compared to white borrowers, but when the Bank did extend credit, it did so on predatory terms.  This combination of reverse

---

[5] California Reinvestment Coalition, *From Foreclosure to Re-Redlining* (2010), at 4 (available at http://www.calreinvest.org/system/resources/.../Foreclosure_to_Re_Redlining.pdf).

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12  658984 V2

redlining and redlining represents a continuing and unbroken pattern and practice of mortgage lending discrimination in Los Angeles that still exists today.

9.     Citi's pattern and practice of *reverse redlining* has caused an excessive and disproportionately high number of foreclosures on the Citi Loans it has made in the minority neighborhoods of Los Angeles.  Foreclosures on loans originated by Citi are concentrated in these neighborhoods even though the bulk of Citi's lending in Los Angeles is in white neighborhoods.  *A loan in a predominantly minority neighborhood is 4.774 times more likely to result in foreclosure than is a loan in a predominantly white neighborhood.*

10.     Citi's pattern and practice of *traditional redlining* has also caused an excessive and disproportionately high number of foreclosures in the minority neighborhoods of Los Angeles.  These foreclosures often occur when a minority borrower who previously received a predatory loan sought to refinance the loan, only to discover that Citi refused to extend credit at all, or on terms equal or similar to those in refinance loans offered to white borrowers.  The inevitable result of the combination of issuing a predatory loan, and then refusing to refinance the loan, was foreclosure.

11.     Citi would have had comparable foreclosure rates in minority and white communities if it had properly and uniformly applied responsible underwriting practices in both areas.  Citi possesses sophisticated underwriting technology and data that allows it to predict with precision the likelihood of delinquency, default, or foreclosure.  The fact that Citi's foreclosures are so disproportionately concentrated in minority neighborhoods is not the product of random events.  To the contrary, it reflects and is fully consistent with Citi's practice of targeting minority neighborhoods and customers for discriminatory practices and predatory pricing and products.  It also reflects and is consistent with Citi's practice of failing to underwrite minority borrowers' applications properly, and of putting these borrowers into loans

- 4 -

which (1) have more onerous terms than loans given to similarly situated white borrowers, and (2) the borrowers cannot afford, leading to foreclosures.

12.    The Bank's discriminatory lending practices, including targeting of minorities and the discretion and incentive arrangements that result in the disproportionate issuance of discriminatory loans to minorities, are evidenced by information from confidential witness statements provided by former employees of Citi (discussed further herein).  For example:

(a)    "I definitely saw people with good credit scores in subprime."

(b)    "They (management) teach you to be very persuasive and not take no for an answer. . . You try to convince them to use the equity in their home."

(c)    "They would kick back a lot of the minorities and old people" as unqualified for loan modifications.  "I couldn't talk on the phone with them anymore.  I'd just say, 'Oh my God, I wish I could help you.'  They were in financial hardship.  It was just awful.  Awful."

(d)    Citi "wasn't really thinking about preserving the property or keeping the people in the property.  It was just foreclose, foreclose, foreclose."

13.    The reports of these witnesses are confirmed when Los Angeles data on Citi loans is examined.  Such an examination reveals a widespread practice of discrimination.  For example, a regression analysis that controls for credit history and other factors demonstrates that an African-American Citi borrower is 2.273 times more likely to receive a predatory loan than was a white borrower, and a Latino borrower was 2.389 times more likely to receive such a loan.  The regression analysis confirms that African-Americans with FICO scores over 660 are 3.050 times more likely to receive a predatory Citi loan as is a white borrower, and a Latino borrower is 2.614 times more likely to receive such a loan.

- 5-

14.     A variety of governmental and private actions have been asserted against Citi relating to predatory lending practices.  In 2000, Citi acquired Associates First Capital Corporation, which was widely criticized for predatory lending practices.  Citi eventually settled with the Federal Trade Commission by agreeing to pay $240 million to customers who had been victims of predatory practices.  In 2007, Citi indicated that its exposure to subprime mortgages was less than $13 billion, when in fact it was over $50 billion; the Securities and Exchange Commission said that Citi had made misleading statements about the company's exposure.  In 2010, Citi agreed to pay $75 million to settle civil charges that it misled investors over potential losses from high-risk mortgages.  In 2012, Citi agreed to pay $158 million to settle claims that it falsely certified the quality of loans issued by its CitiMortgage unit over a period of more than six years, so that they would qualify for insurance from the Federal Housing Administration.

15.     During the financial crisis of 2008, Citi suffered huge losses and was rescued in a massive stimulus package by the U.S. government.  In 2009, Citi announced that the United States government would take a large equity stake in the company by converting emergency aid into common shares with a U.S. Treasury credit line to prevent bankruptcy.  In 2010, Citi repaid the government aid and repurchased its shares from the U.S. government.  In fact, Citi amassed a huge cash flow in the wake of the financial crisis.  The Bank's discriminatory practices and resulting foreclosures in the City's minority neighborhoods have inflicted significant, direct, and continuing financial harm to the City.

16.     One report[6] has estimated the impact that the City of Los Angeles has suffered as follows:

---

[6] Alliance of Californians for Community Empowerment and the California Reinvestment Coalition, *The Wall Street Wrecking Ball:  What Foreclosures are Costing Los Angeles Neighborhoods* (September 2011).

- 6-

- Overall, Los Angeles homeowners are estimated to have lost $78.8 billion in home values as a direct result of the 200,000 foreclosures for 2008-2012 alone.

- Property tax revenue losses are estimated to be $481 million in the wake of the foreclosure crisis.

- The typical foreclosure costs local governments more than $19,000 for increased costs of safety inspections, police, and fire calls, trash removal, and property maintenance.  In Los Angeles, these costs are estimated to be $1.2 billion.

- Los Angeles has 79,029 homeowners underwater, totaling $7.3 billion in loan value.  If banks wrote down those mortgages, it could pump $780 million into the local economy, and create 11,353 jobs.

17.     In this action the City seeks damages for reduced property tax revenues based on:  (a) the decreased value of the vacant properties themselves; and (b) the decreased value of properties surrounding the vacant properties.  In addition, the City seeks damages based on the cost of municipal services that will be required to remedy the blight and unsafe and dangerous conditions which exist at vacant properties that were foreclosed as a result of Citi's illegal lending practices.

18.     Because of the multitude of analytic tools available to Citi to determine the likelihood that a particular mortgage loan would result in default by the borrower, as well as the existence of various studies, reports, and other pertinent literature specifically addressing the connection between mortgage loans and foreclosures, it was foreseeable that Citi knew, or should have known, that a predatory or high risk loan issued to an African-American or Hispanic in certain neighborhoods in Los Angeles would result in default and subsequent foreclosure.  Moreover, because Citi maintains numerous branch offices throughout Los Angeles, and has knowledge of the specific address for each loan it issued, it was foreseeable that Citi knew, or should have known, of the condition of foreclosed properties

- 7-

corresponding to loans that it issued in Los Angeles, regardless of whether it served the loan or subsequently sold the servicing rights to a third party.

19.     According to Federal Reserve Chairman Bernanke, "foreclosures can inflict economic damage beyond the personal suffering and dislocation that accompany them.  Foreclosed properties that sit vacant for months (or years) often deteriorate from neglect, adversely affecting not only the value of the individual property but the values of nearby homes as well.  Concentrations of foreclosures have been shown to do serious damage to neighborhoods and communities, reducing tax bases and leading to increased vandalism and crime.  Thus, the overall effect of the foreclosure wave, especially when concentrated in lower-income and minority areas, is broader than its effects on individual homeowners."[7]

20.     The discriminatory lending practices at issue here have resulted in what many leading commentators describe as the "greatest loss of wealth for people of color in modern US history."  It is well-established that poverty and unemployment rates for minorities exceed those of whites, and therefore, home equity represents a disproportionately high percentage of overall wealth for minorities.[8]  Indeed, between 2005-2009, the median wealth of Latino households decreased by 66 percent, and the median wealth of African-American households decreased by 53 percent, while the median wealth of white households decreased just 16 percent.[9]  As Federal Reserve Chairman Bernanke recently explained, as a result of the housing crisis, "most or all of the hard-won gains in homeownership made by low-income and minority communities in the past 15 years or so have been reversed."[10]  The

---

[7] Bernanke, *supra* n.4 at p. 2.

[8] Robert Schwemm and Jeffrey Taren, *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act,* 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV., 375, 382 (2010).

[9] Alliance of Californians for Community Empowerment, *California in Crisis: How Wells Fargo's Foreclosure Pipeline is Damaging Local Communities*, (2013) pg. 6 *available at* www.calorganize.org.

[10] Bernanke, *supra* n.2 at p. 2.

- 8-

resulting impact of these practices represents "nothing short of the preeminent civil rights issue of our time, erasing, as it has, a generation of hard fought wealth accumulation among African Americans."[11]

## II.   PARTIES

21.     Plaintiff City of Los Angeles is a municipal corporation, organized pursuant to Article XI of the California Constitution.  The City is authorized by the City Council to institute suit to recover damages suffered by the City as described herein.

22.     Citigroup Inc. is a multinational financial services corporation and bank holding company.  Upon information and belief, its corporate headquarters are located in New York, New York.  Citigroup was formed from one of the world's largest mergers in history by combining the banking giant Citicorp, and financial conglomerate Travelers Group, in October 1998.  It is currently one of the largest banks in the United States.  Citigroup's major brand names include Citibank, CitiFinancial, Primerica, Citi Smith Barney, Banamex, and Nikko.  Citigroup owns and controls Citibank, N.A.

23.     Upon information and belief, Citibank's corporate headquarters are located in Sioux Falls, South Dakota.  Citibank is organized as a national banking association under the laws of the United States.  Citibank owns CitiMortgage, Inc.

24.     Upon information and belief, CitiMortgage is based in O'Fallon, Missouri.  CitiMortgage is an operating subsidiary of Citibank.  CitiMortgage maintains offices in the State of California for the purposes of soliciting applications for and making residential mortgage loans, and engaging in other business activities, including specifically with the City of Los Angeles.

---

[11] Charles Nier III and Maureen St. Cyr, *A Racial Financial Crisis: Rethinking the Theory of Reverse Redlining to Combat Predatory Lending Under the Fair Housing Act*, 83 TEMPLE LAW REV. 941, 942 (2011).

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12  658984 V2

25.     The CitiFinancial Mortgage division of Citi offered exclusively non-prime loans.  These loans were offered to both consumer direct and wholesale clients.

26.     In 2009, Citi announced that it would realign into two businesses, Citicorp and Citi Holdings.  The latter, Citi Holdings, included CitiMortgage. Regarding Citi's strategy for these businesses going forward, Citi explained "management will focus on tightly managing risks and losses, and maximizing the value of these assets."  And, "with the new Citi Holdings, we will be able to tighten our focus on risk management…."[12]

27.     The Defendants in this action are, or were at all relevant times, subject to Federal laws governing fair lending, including the FHA, and the regulations promulgated under each of those laws.  The FHA prohibits financial institutions from discriminating on the basis of, inter alia, race, color, or national origin in their residential real estate-related lending transactions.

28.     The Defendants in this action are or were businesses that engage in residential real estate-related transactions in the City of Los Angeles, within the meaning of the FHA, 42 U.S.C. § 3605.

29.     Based on information reported pursuant to the Home Mortgage Disclosure Act, in addition to loans that Defendants originated directly, Defendants are responsible for residential home loans acquired from, and/or sold by or through, ABN Amro Mortgage Group, Inc., Argent Mortgage Co., Ameriquest Mortgage Co., and Town & Country Credit Corp.

30.     Upon information and belief, Plaintiff alleges that each of the Defendants was and is an agent of the other Defendants.  Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies, and/or the alleged acts or

---

[12] Press Release, Citigroup Inc., Citi to Reorganize into Two Operating Units to Maximize Value of Core Franchise (Jan. 17, 2009) (on file with author).

- 10-

omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal. Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting through its agents, and is liable on the basis of the acts and omissions of its agents.

### III.    JURISDICTION AND VENUE

31.    This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613, and 28 U.S.C. §§ 1331, 1343, because the claims alleged herein arise under the laws of the United States.

32.    Venue is proper in this district under 28 U.S.C. § 1391(b), because Citi conducts business in this District, and a substantial part of the events and omissions giving rise to the claims occurred in this District.

### IV.    FACTUAL BACKGROUND

33.    Prior to the emergence of subprime lending, most mortgage lenders made only "prime" loans. Prime lending offered uniformly priced loans to borrowers with good credit, but individuals with lower credit were not eligible for prime loans.

34.    Subprime lending developed and began growing rapidly in the mid-1990s as a result of technological innovations in risk-based pricing and in response to the demand for credit by borrowers who were denied prime credit by traditional lenders. Advances in automated underwriting allowed lenders to predict with improved accuracy the likelihood that a borrower with lower credit would successfully repay a loan. These innovations gave lenders the ability to adjust the price of loans to match the different risks presented by borrowers whose credit records did not meet prime standards. Lenders found that they could now accurately price loans to reflect the risks presented by a particular borrower. When done responsibly, this made credit available much more broadly than had been the case with prime lending.

- 11-

35.     Responsible subprime lending has opened the door to homeownership to many people, especially low- to moderate-income and minority consumers, who otherwise would have been denied mortgages.  At the same time, however, subprime lending has created opportunities for unscrupulous lenders to target minorities and engage in discriminatory, irresponsible lending practices that result in loans that borrowers cannot afford.  This, in turn, leads directly to defaults and foreclosures.

36.     Enticed by the prospect of profits resulting from exorbitant origination fees, points, and related pricing schemes, some irresponsible subprime lenders took advantage of a rapidly rising real estate market to convince borrowers to enter into discriminatory loans that had unfair terms that they could not afford.  Often this was accomplished with the help of deceptive practices and promises to refinance at a later date.  These abusive subprime lenders did not worry about the consequences of default or foreclosure to their business because, once made, a significant number of the loans were sold on the secondary market.

37.     As the subprime market grew, the opportunities for abusive practices grew with it.  As a consequence, the federal government has found that abusive and predatory practices "are concentrated in the subprime mortgage market."[13]  These practices, which in recent years have become the target of prosecutors, legislators, and regulators, include the following:

a.     Placing borrowers in subprime loans even though they qualify for prime or conventional loans on better terms.

b.     Failing to prudently underwrite hybrid adjustable rate mortgages (ARMs), such as 2/28s and 3/27s.[14]  After the borrower pays a low "teaser rate" for

---

[13] United States Department of Housing & Urban Development and United States Department of the Treasury, Curbing Predatory Home Mortgage Lending (2000) at 1 (*available at* http://www.huduser.org/Publications/pdf/treasrpt.pdf) ("HUD/Treasury Report").

[14] In a 2/28 ARM, the "2" represents the number of years the mortgage will be fixed over the term of the loan, while the "28" represents the number of years the interest rate paid on the mortgage will be variable.  Similarly, in a 3/27 ARM, the

- 12 -

the first two or three years, the interest rate on these loans resets to a much higher rate that can continue to rise based on market conditions.  Subprime lenders often underwrite these loans based only on considerations of whether the borrower can make payments during the initial teaser rate period, without regard to the sharply higher payments that will be required for the remainder of a loan's 30-year term. Irresponsible lenders aggressively market the low monthly payment that the borrower will pay during the teaser rate period, misleading borrowers into believing that they can afford that same low monthly payment for the entire 30-year term of the loan, or that they can refinance their loan before the teaser rate period expires.

       c.     Failing to prudently underwrite refinance loans, where borrowers substitute unaffordable mortgage loans for existing mortgages that they are well-suited for and that allow them to build equity.  Such refinanced loans strip much, or even all, of that equity through substantial new fees, often hiding the fact that the high settlement costs of the new loan are also being financed.  Lenders that aggressively market the notion that borrowers can pay off existing credit card and other debts by refinancing all of their debt into one mortgage loan mislead them into believing that there is a benefit to debt consolidation, while obscuring the predictable fact that the borrower will not be able to repay the new loan.  The refinanced loans are themselves often refinanced repeatedly, with ever-increasing fees and higher interest rates, and with ever-decreasing equity, as borrowers seek to stave off foreclosure.

       d.     Allowing mortgage brokers to charge "yield spread premiums" for qualifying a borrower for an interest rate that is higher than the rate the borrower qualifies for and can actually afford.

       e.     Failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, reserves, and

---

interest rate is fixed for three years and variable for the remaining 27-year amortization.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12  658984 V2

work history.  These criteria ensure that a borrower is obtaining a loan that he or she has the resources and assets to repay, ignoring these criteria often results in loans that bear no relation to borrowers' ability to repay them.  This allows the lender to make a quick profit from the origination, but sets the borrower up for default and foreclosure.

f.      Requiring substantial prepayment penalties that prevent borrowers whose credit has improved from refinancing their subprime loan to a prime loan.  Prepayment penalties not only preclude borrowers from refinancing to a more affordable loan, but reduce the borrowers' equity when a subprime lender convinces borrowers to refinance needlessly one subprime loan with another.

g.      Charging excessive points and fees that are not associated with any increased benefits for the borrower.

38.     The problem of predatory practices in subprime mortgage lending is particularly acute in minority communities because of "reverse redlining."  As used by Congress and the courts, the term "reverse redlining" refers to the practice of targeting residents in certain geographic areas for credit on unfair terms due to the racial or ethnic composition of the area.  This is in contrast to "redlining," which is the practice of denying *prime* credit to specific geographic areas because of the racial or ethnic composition of the area.  Both practices have repeatedly been held to violate the Federal Fair Housing Act.

39.     Following the onset of the subprime mortgage crisis, and after years of issuing abusive home loans in minority neighborhoods, the big bank lenders began to limit the issuance of mortgage credit to minority borrowers (*i.e.*, refusing to refinance predatory loans).  At the same time, when the big banks did extend credit, they continued to do so on predatory terms.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12  658984 V2

## V.   CITI ENGAGED IN DISCRIMINATORY LENDING PRACTICES

**A.   Citi's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act**

    **1.   Discriminatory lending results in a disproportionate number of foreclosures in minority areas.**

40.   Foreclosures are on the rise in many of the nation's most vulnerable neighborhoods, particularly those with substantial concentrations of minority households.  The increase appears to stem from the presence of:  (1) subprime lending in these communities; and (2) continuing discriminatory lending practices (*e.g.*, steering minorities into loan products with more onerous terms – which happen to be more profitable for Citibank).

41.   A seminal report on foreclosure activity by Mark Duda and William Apgar documents the negative impact that rising foreclosures have on low-income and low-wealth minority communities, using Chicago as a case study.  Mr. Apgar is a Senior Scholar at the Joint Center for Housing Studies of Harvard University, and a Lecturer on Public Policy at Harvard's John F. Kennedy School of Government.  He previously served as the Assistant Secretary for Housing/Federal Housing Commissioner at the U.S. Department of Housing and Urban Development, and also Chaired the Federal Housing Finance Board.  Mr. Apgar holds a Ph.D. in Economics from Harvard University.  Mr. Duda is a Research Fellow at the Joint Center for Housing Studies.  The Apgar-Duda report has continually been cited by subsequent governmental, public sector, and private sector reports due to its clarity and thoroughness with respect to the negative impact foreclosures have on lower-income and minority neighborhoods.[15]

42.   This significant report highlights the foreseeability of foreclosures arising from predatory lending practices and their attendant harm, demonstrating that

---

[15] *See* W. Apgar, M. Duda & R. Gorey, *The Municipal Costs of Foreclosures:  A Chicago Case Study* (2005) (*available at* http://www.nw.org/network/neighborworksProgs/foreclosuresolutions/documents/2005Apgar-DudaStudy- FullVersion.pdf).

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12 658984 V2

such foreclosures impose significant and predictable costs on borrowers, municipal governments, and neighboring homeowners.

43.     Another report, by the Center for Responsible Lending, uses a national dataset to show that the foreclosure rate for low- and moderate-income African-Americans is approximately 1.8 times higher than it is for low- and moderate-income non-Hispanic whites.  The gap is smaller for Latinos, especially among low-income households, but even among low-income Latinos the foreclosure rate is 1.2 times that of low-income whites.  Racial and ethnic disparities in foreclosure rates cannot be explained by income, since disparities persist even among higher-income groups.  For example:  approximately 10 percent of higher-income African-American borrowers, and 15 percent of higher-income Latino borrowers, have lost their homes to foreclosure, compared with 4.6 percent of higher income non-Hispanic white borrowers.  Overall, low- and moderate-income African-Americans, and middle- and higher-income Latinos, have experienced the highest foreclosure rates.[16]

44.     Nearly 20 percent of loans in high-minority neighborhoods have been foreclosed upon or are seriously delinquent, with significant implications for the long-term economic viability of these communities.[17]

**2.     Minority neighborhoods are disproportionate recipients of predatory loans.**

45.     There is a substantial body of empirical evidence demonstrating the prevalence of reverse redlining in the subprime mortgage market.  These studies show that, even after controlling for creditworthiness and other legitimate underwriting factors, subprime loans and the predatory practices often associated with subprime lending are disproportionately targeted at minority neighborhoods.[18]

---

[16] Center for Responsible Lending, *Lost Ground, 2011:  Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* http:/www.responsiblelending.org/-mortgage-lending/research-analysis/*Lost-Ground-2011*.pdf).

[17] *Id.*

[18] *See* Abt Associates, *Using Credit Scores to Analyze High-Cost Lending in Central City Neighborhoods* (2008); Center for Responsible Lending, *Lost Ground,*

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12  658984 V2

46.     In general, as recently observed by the Federal Reserve in December 2012, both African-American and Hispanic borrowers were far more likely (in fact, nearly twice as likely) to obtain higher-priced loans than were white borrowers. These relationships hold both for home-purchase and refinance lending, and for non-conventional loans.  These differences are reduced, but not eliminated, after controlling for lender and borrower characteristics.  "Over the years, analyses of HMDA data have consistently found substantial differences in the incidence of higher-priced lending and in application denial rates across racial and ethnic lines, differences that cannot be fully explained by factors included in the HMDA data."[19]

47.     African-Americans and Hispanics were much more likely to receive subprime loans and loans with features that are associated with higher foreclosures, specifically prepayment penalties and hybrid or option ARMs.  These disparities were evident even comparing borrowers within the same credit score ranges.  In fact, the disparities were especially pronounced for borrowers with higher credit scores. For example, among borrowers with a FICO score of over 660 (indicating good

---

*2011: Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/mortgage-lending/research-analysis/*Lost-Ground--2011*.pdf ); Center for Responsible Lending, *Unfair Lending:  The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (2006) (*available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-Unfair_Lending-0506.pdf); Finance and Economics Discussion Series Divisions of Research & Statistics and Monetary Affairs Federal Reserve Board, Washington, D.C, *Subprime Mortgages: What, Where, and to Whom?* (2008) (*available at* http://www.nber.org/papers/w14083.pdf?new_window=1 ); C. Reid and E. Laderman, Federal Reserve Bank of San Francisco, *The Untold Costs of Subprime Lending: Examining the Links among Higher-Priced Lending, Foreclosures and Race in California*, Presented at Brandeis University (2009) (*available at* http://iasp.brandeis.edu/pdfs/Author/reid-carolin/The%20Untold%20Costs%20of%20Subprime%20Lending%203.pdf).

[19] Federal Reserve Bulletin, *The Mortgage Market in 2011: Highlights from the Data Reported under the Home Mortgage Disclosure Act* (Dec. 2012) (*available at* http://www.federalreserve.gov/pubs/bulletin/2012/PDF/2011_HMDA.pdf).

- 17 -

credit), African-Americans and Latinos received a high interest rate loan more than three times as often as white borrowers.[20]

48.   In addition to receiving a higher proportion of higher-rate loans, African-Americans and Latinos also were much more likely to receive loans with other risky features, such as hybrid and option ARMs and prepayment penalties. Disparities in the incidence of these features are evident across all segments of the credit spectrum.

49.   A 2010 Report from the California Reinvestment Coalition finds: "[The] hardest-hit communities are racially concentrated, low to moderate income areas of African-Americans and Latinos that were saturated with high-cost, subprime lending since 2000.  Neighborhoods once redlined – where lenders refused to lend in neighborhoods of color without regard to the actual financial qualifications of residents – were flooded in the past decade with high-cost subprime loans and abusive option ARM loans.  These loans were often unaffordable and unsustainable for working class families, and inevitably led to large scale foreclosures.  In the past two years, borrowers and communities struggling to preserve their primary asset – their home – have found that banks are not willing to work with them to restructure their mortgages or to offer new loans."[21]  Key findings from the 2010 Report include:

(a)   In 2008, minority neighborhoods contained roughly 63% of the housing in Los Angeles, but suffered over 90% of the City's foreclosures.

(b)   While predatory and fraudulent lending helped precipitate the foreclosure crisis, a wave of a resetting option ARM loans threatens to keep California immobilized by foreclosure beyond 2010.

---

[20] Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/-mortgage-lending/research-analysis/*Lost-Ground-2011*.pdf).

[21] California Reinvestment Coalition, *From Foreclosure to Re-Redlining,* at 1 (2010) (available at http://www.calreinvest.org/system/resources/.../Foreclosure_to_Re_Redlining.pdf).

- 18-

(c)   California cities are more likely than the national average to be saturated with low documentation loans (*e.g.*, stated income loans).  In Los Angeles, 74% of all loans in the sample were made with limited documentation, as compared to only 56% for all loans in the sample.

(d)   Minority neighborhoods saw a dramatic decrease in lower cost prime loans in 2008.  The drop off from 2006 to 2008 was stunning.  In Los Angeles, less than $1/3^{rd}$ as many prime loans were made available by big bank lenders in minority neighborhoods in 2008, as compared to 2006.

(e)   In 2008, nearly one out of two African-Americans and Latinos seeking a home loan or refinance were denied, as compared to only about one in four whites.

(f)   Even though high-cost lending began to decrease significantly by 2008, when it occurred, it was still more likely to occur in minority neighborhoods as compared to white neighborhoods.  The big bank lenders still were more than twice as likely to sell subprime loans in minority neighborhoods in Los Angeles, as compared to white neighborhoods.

(g)   In many cases, minority borrowers were overburdened not only by subprime lending but by other onerous loan terms, such as prepayment penalties, yield spread premiums, option ARMs, and HELOCs, all of which have been conducive to foreclosures.

(h)   In a March 2009 survey, two-thirds of housing counselors reported that they believed borrowers of color were receiving worse foreclosure prevention outcomes than white borrowers.

(i)   In the wake of the subprime meltdown, as underwriting tightened for all loans, higher cost FHA mortgage loans were the "only game in town" left for many new homebuyers.

50.   Since 2008, as the data discussed below makes clear, there has been a shift in the types of loans issued – and not issued – by the Bank.  For example, the Bank shifted from offering new subprime loans toward issuing more Home Equity Lines of Credit (HELOCs) and higher cost FHA/VA loans.[22]  FHA and VA

---

[22] While FHA/VA loans are not inherently predatory, these loans have higher risk features such as higher fees and higher interest rates.  When banks target minorities

- 19 -

government loans are characterized as higher risk loans because: (1) they are typically more expensive for a borrower than conventional loans, and include fees and costs not associated with conventional loans; and (2) several of the government loan programs permit negative amortization.[23] At the same time, in the last several years, the Bank tightened lending requirements in a manner that drastically limited the ability of minority borrowers to refinance or otherwise modify the subprime loans previously issued by the Bank.

51.   A 2011 Report from the California Reinvestment Coalition found that between 2008 and 2009, in Los Angeles, the number of conventional refinance loans made in predominantly white neighborhoods more than doubled (increasing by about 200%), while conventional refinance loans declined in the City's minority neighborhoods where such refinancing was most desperately needed.[24]

52.   At the same time that conventional credit has contracted, FHA lending has expanded dramatically. During the subprime boom, FHA lending fell as subprime lenders targeted minority communities. Now, with little or no subprime lending, and conventional credit restricted, FHA lending has shot up. Overall, the share of loans with government backing went from 5% in 2005 to 26.6% in 2010.[25]

53.   For African-Americans, the share of mortgages used to purchase a home and backed by a government program increased to almost 80% in 2010; for Latinos the share increased to 73%. But for whites, the share increased to only 49%. At

---

for FHA/VA loans, and issue more of them to minorities, they are acting in a discriminatory manner.

[23]  California Reinvestment Coalition, et al., *Paying More for the American Dream VI, Racial Disparities in FHA/VA Lending,* (July 2012); www.fha.com/fha_loan_types; www.benefits.va.gov/homeloans.

[24] California Reinvestment Coalition et. al., *Paying More for the American Dream V: The Persistence and Evolution of the Dual Market* (2011) (*available at* http://www.community-wealth.org/sites/clone.community-wealth.org/files/downloads/report-crc-et-al.pdf).

[25] Center for Responsible Lending, *The State of Lending in America & its Impact on U.S. Households,* at 44 (2012) (*available at* http://www.responsiblelending.org/state-of-lending/State-of-Lending-report-1.pdf).

- 20-

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12 658984 V2

present, most minority borrowers cannot gain access to the conventional mortgage market and, instead, are relegated to more expensive FHA loans.[26]

54.   A 2012 Report from the California Reinvestment Coalition "shows that black and Latino borrowers and borrowers in communities of color received government-backed loans – insured by the Federal Housing Administration (FHA) or guaranteed by the Department of Veterans Affairs (VA) – significantly more often than did white borrowers.  The findings indicate persistent mortgage redlining, and raise serious concerns about illegal and discriminatory loan steering…. [T]he report shows a pattern of two-tiered lending, in which borrowers and communities of color received disproportionately fewer conventional mortgages and disproportionately more government-backed loans than did white borrowers and communities…. [T]he disproportionate prevalence of FHA loans in communities of color raises fair lending flags."  In particular, the 2012 Report observes that:  "In Los Angeles, homebuyers in neighborhoods of color received government-backed loans five times more often than did those in predominantly white neighborhoods…. [H]omeowners in communities of color received FHA or VA refinance loans 6.5 times more often than did homeowners in predominantly white neighborhoods."[27]

**B.   Citi Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act, as Demonstrated by Former Bank Employees**

55.   Confidential Witnesses ("CWs") are former Citi employees responsible for making, processing, and/or underwriting loans on behalf of Citi in the greater Los Angeles region.  CWs describe how Citi has targeted minorities and residents of minority neighborhoods in and around Los Angeles for predatory lending practices.

---

[26] *Id*. at 45.

[27] California Reinvestment Coalition, *Paying More for the American Dream VI: Racial Disparities in FHA/VA Lending* (2012) (*available at* http://calreinvest.org/system/resources/W1siZiIsIjIwMTIvMDcvMTgvMTZfMzVfM jNiMV9wYXlpbmdtdb3JlVklfbXVsdGlzdGF0ZV9qdWx5MjAxMl9GSU5BTC5wZ GYiXV0/payingmoreVI_multistate_july2012-%20FINAL.pdf).

- 21 -

56.     CW1 worked as an Area Sales Manager for CitiMortgage from 2004 to 2005 in the Los Angeles area.  He managed several loan officers who originated loans for minority borrowers from a wide region, including the City of Los Angeles.

57.     CW2 was a mortgage call center manager during the 2009-2011 timeframe, employed by an outsourcing company that was retained by CitiMortgage to run its call center in Southern California.  He dealt with existing CitiMortgage borrowers who were seeking a refinance of their loan.  He worked on about 10 refinance applications a day, speaking with borrowers and collecting documentation.

58.     The callers who spoke with CW2 were prescreened by a CitiMortgage call center in St. Louis.  The pre-screeners would calculate the loan-to-value ratio of the borrower's property.  If it was 80 percent or more, the borrower was sent to CitiMortgage's Loss Retention Department in Ann Arbor.  If the borrower had missed any payments during the previous 12 months by more than 30 days, the borrower was referred to the Loss Mitigation Department.  The Loss Mitigation Department addressed loan modifications and government-assisted programs like the Home Affordable Modification Program ("HAMP"), as well as foreclosure or short sale proceedings.  No borrowers who were underwater in their home or had missed a payment, were eligible for a refinance.  If the loan-to-value ratio was 80 percent or less, and the borrower had paid the note on time during the last 12 months, then the borrower was pre-screened to apply for a refinance.  At that point, the borrowers were referred to CitiMortgage's Retention Department.

59.     From 2003 to 2008, CW3 worked at CitiMortgage as a senior underwriter, then as an underwriting manager and credit risk administrator, and finally as an Account Executive in Southern California.  She underwrote or oversaw the underwriting of loans from the Southern California region, including the City of Los Angeles.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12  658984 V2

60.     CW3 described CitiMortgage's internal underwriting guidelines at the time as being mostly in line with Fannie Mae guidelines, except that CitiMortgage had a few "overlays" of their own guidelines.  Underwriters had modest leeway to "write outside of the box" for good loan candidates that did not meet the guidelines; the Bank's Credit Risk Administrators could override the guidelines for more significant loan application variances.  Credit Risk Administrators, she said, operated under their own set of guidelines provided by CitiMortgage's Credit Policy Department.

61.     During the 2010-2011 timeframe, CW4 worked as an assistant account manager and client advisor for an outsourcing company that serviced Citibank mortgages.  She worked with Citibank borrowers who were behind on their payments and were hoping to refinance or modify their existing loans.  Many of the borrowers were minorities, including minorities from the City of Los Angeles.

62.     Similarly, during the 2010-2011 timeframe, CW5 worked as a client advisor for an outsourcing company that serviced Citibank mortgages, working with Citibank borrowers who were behind on their payments and were hoping to refinance or secure loan modifications.  Many of the borrowers were minorities, including minorities from the City of Los Angeles.  Her job was to prescreen callers and determine which Citi loan program the borrower qualified for:  the HAMP program, the HARP program, Citi's in-house modification program, refinancing the existing loan, holding a short sale, or a "deed in lieu" to avoid a foreclosure.

63.     CW6 was a loan account executive for CitiFinancial, working out of multiple branches in southern California from 2008 to 2009.  His job was to sell mortgages and personal loans mostly to lower income customers, including minority borrowers in the City of Los Angeles.  The goal was to encourage borrowers to consolidate their growing personal loan debt.  During his employment, CitiFinancial

- 23-

– a division of Citi – principally sold mortgages with very high interest rates, *e.g.*, between 7 and 12 percent higher than the going rate.

64.     These CWs confirm that Citi targeted minorities and minority neighborhoods in Los Angeles and elsewhere for deceptive, abusive, and predatory loans, and that Citi's loan officers and brokers engaged in a myriad of deceptive, abusive, and predatory practices.

**1.     Citi targets minorities for predatory loan terms.**

65.     CW6 confirmed that the CitiFinancial sales team was financially incentivized to sell mortgages.  They received a substantial bonus for every mortgage they closed, and the bonus amount CW6 received for each loan increased, depending on how many loans he sold in a month.  CW6 said he was often uncomfortable about pushing customers into expensive loans that perhaps were not in the borrowers' best interests.  He tried to talk to his manager about it, but the manager told him, "We're not making them sign."

66.     CW6 said customers were often desperate and struggling financially, lacked education, and often spoke little English.  Most did not understand the repercussions of the mortgages they signed.  The one thing they understood and were most focused on was the monthly payment.  "We were told to sell it on the monthly payment," he said.  "Not the (interest) rate."  By consolidating credit card or personal loan debts into a 30-year mortgage, the Bank stretched the payments out over a much longer time period, and therefore the refinancing lowered the amount required to pay every month.

67.     When CW6 told distressed, low-income borrowers that their monthly debt payments would decrease by a few hundred dollars every month if they took out a mortgage, it was an enticing offer.  It was often all they cared about.  He was instructed to downplay the interest rate, which was extremely high, by emphasizing the lower monthly payment.  "They (management) teach you to be very persuasive

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12  658984 V2

1    and not take no for an answer." CW6 said salespeople were required to inform the

2    borrower of the monthly payment, the interest rate and length of the loan, but

3    nothing else. Salespeople were discouraged from explaining the loan and its more

4    complicated repercussions in detail to the borrower. They did not instruct the

5    borrower on the repercussions of the loan, or explain how the borrower would now

6    be paying interest on a $5,000 personal loan for 30 years.

7          68.    According to CW6, about 80 percent of the customers targeted for

8    bigger and more expensive personal loans were minorities. An even higher

9    percentage the Bank targeted for mortgages were minorities. If the borrower had

10   personal debts and an existing mortgage, salespeople were taught to push a second or

11   even a third mortgage to consolidate the personal debt. If the borrower had equity in

12   their home, the salespeople were taught to push a loan that would pull the equity out

13   of the house as a cash payout or to pay down personal debts. "You try to convince

14   them to use the equity in their home," he said. Salespeople suggested the borrowers

15   use the equity to go on vacation, pay off debts, or save for a rainy day. These

16   borrowers were predominantly minorities.

17         69.    As part of his job, CW6 was provided with customer lead lists. The

18   leads were predominantly minorities. Other potential customers called into

19   CitiFinancial inquiring about marketing materials that were mailed to lower income,

20   minority neighborhoods.

21         70.    When CW6 worked in his base branch, which was located in a wealthy,

22   predominantly white neighborhood, he did not have any white, middle-class

23   customers. Instead, the majority of his customers were lower-income minorities who

24   had been targeted by CitiFinancial marketing in their neighborhoods or they were on

25   lead lists that were heavily weighted with minorities. When he worked in Los

26   Angeles branches, he said the number of minority customers was even higher, and

27   that the sales teams there were even more aggressive about selling mortgages.

28

- 25-

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12 658984 V2

**2.    Citi gives its employees discretion to steer people who qualify for prime mortgages into discriminatory mortgages (and pays its employees more for doing so).**

71.    CW1's loan officers sold both subprime and prime loans.  Inevitably, some loan officers pushed subprime loans because they received higher compensation (*e.g.*, in the form of bonuses to sell them).  He said he saw borrowers in subprime loans who would have qualified for a better, prime-level loan.  "I definitely saw people with good credit scores in subprime," he said.

**3.    Citi limits the ability of minority customers to refinance out of the same predatory loans that they previously received from the Bank.**

72.    The confidential witness statements show that Citi induced foreclosures by failing to offer refinancing or loan modifications to minority customers on fair terms – which constitutes a particularly egregious form of redlining, given the fact that minority borrowers sought refinancing or loan modifications with respect to bad loans that the Bank previously made to them.

73.    According to CW2, many otherwise qualified refinance applicants were unable to prove their financial situation with the documents now required by CitiMortgage.  He said many of these types of borrowers were now "stuck" in the terms of their existing "no doc" loans.  They were frustrated and angry that they could not refinance because, when they signed the loans, they were told that they could refinance later.  "They had nowhere to turn."  CW2 said a large percentage – he estimated 40% – of the people stuck in this situation were minorities (with a notably high rate of Hispanics).  They lived all over the country (including the Los Angeles area).

74.    CW2 explained that many of these borrowers were in loans that were about to adjust upwards dramatically, causing their monthly payments to potentially double.  And many of these borrowers were in interest-only loans that were about to start requiring payments on the principal amount, as well as higher interest rate

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12 658984 V2

payments.  These borrowers, he said, could not understand why CitiMortgage now refused to work with them on a refinance of their loans.

75.    Similarly, CW4 said some of the borrowers "were stated income (for the original loan) … Now everything's changed."  Many of the "stated income" borrowers, including members of minority groups from the Los Angeles area, got angry or expressed confusion or frustration when told they would now have to provide documentation of their income in order to qualify for refinance.  The qualification guidelines had changed, she said.  The borrowers felt Citibank had engaged in a bait-and-switch scheme.  CW5 provided much the same statements.

76.    CW5 observed that *non*-minorities tended to qualify more often through Citi for the HARP program.  The HARP program did not damage the borrowers' credit, and drastically lowered the interest rate for the life of the loan, effectively allowing borrowers who were underwater in their homes to refinance at lower market rates.  However, CW5 also observed that minority borrowers stuck in subprime loans would not qualify for HARP, because they were often struggling to keep up with payments, as their adjustable interest rates shifted upwards and/or the interest-only periods ran out.  As a result, she said minority borrowers in subprime loans tended to be screened and told to apply for HAMP program loan modifications.

77.    "They would kick back a lot of the minorities and old people" as unqualified, CW4 said.  "I couldn't talk on the phone with them anymore.  I'd just say, 'Oh my God, I wish I could help you.'  They were in financial hardship.  It was just awful.  Awful."

78.    According to CW5, many of the minorities who had been enticed into expensive adjustable loans were not capable of paying for the loan once the payments adjusted upwards.

79.    CW5 said many minorities attempting to obtain a modification of their subprime loans struggled with Citi's application process that sometimes took several

months.  Citi would repeatedly request more documents over the protracted application process.  Sometimes, she noted, the borrowers would simply receive a denial of the modification from Citi, purportedly for lack of sufficient documents.  She believes that Citi did not do a good job of explaining the process to borrowers or assisting them through this process, and that Citi's lack of assistance to borrowers led to many foreclosures.

80.     In CW5's view, Citi "wasn't really thinking about preserving the property or keeping the people in the property.  It was just foreclose, foreclose, foreclose."  She said it was obvious to everyone within the Bank that borrowers seeking modifications were falling through the cracks and ending up in foreclosure, perhaps unnecessarily.  "This was not one incident, this was a huge problem," she said.

### 4.     Citi engages in other abusive lending practices.

81.     The CW statements further demonstrate that Citi loan officers and brokers had substantial discretion to increase the costliness of loans, and that they regularly used this discretion at the expense of minority borrowers.

82.     During his tenure at CitiMortgage, CW1 was under intense pressure to generate and close loans.  During conference calls every day, for instance, senior managers pushed him and other junior managers to hit their loan quotas (based on loan volume) for their branches.  The area managers were often told that they would be written up and eventually terminated if they failed to meet the loan quotas.  When his loan officers did not meet their quotas two months in a row, he was required to write them up.  If loan officers failed to meet their quota the next month, they were put on final notice and fired the next month.

83.     CW1's loan officers sold both subprime and prime loans.  Inevitably, some loan officers pushed subprime loans because they received higher compensation (*e.g.*, in the form of bonuses to sell them).

- 28-

84.   CW3 stated that CitiMortgage required its underwriting division to put loan denials from minorities through an extra level of review to affirm the reasons for denial.  CitiMortgage's loan applications recorded the race and ethnicity of borrowers, and could be used to pick them out of all of the applications for this heightened review.  When an underwriter recommended denial of a loan application, the underwriter's manager also had to sign off on the denial, verifying it adhered to CitiMortgage guidelines.  If the loan application was from a minority, however, the file was sent to the Credit Risk Administrator for review.  When she was a Credit Risk Administrator at Citi and received a minority denial file to review, she then sent the file to two other Credit Risk Administrators – one in St. Louis and one in Texas – to review.  The three of them would then discuss the file to determine if the denial adhered to loan guidelines.

85.   CitiFinancial management also trained salespeople to push the company's high interest rate mortgages on people who were already struggling to pay their existing debt, CW6 said.  Often these customers had incurred the debt because CitiFinancial had previously pushed personal loans with high interest rates onto the customer.  When the customer would reach his or her debt limit on one loan, CitiFinancial taught its salespeople to push refinancing options on the customer that would extend the length of the loan, lowering the monthly payment, but increasing the interest rate.  The refinancing also included high fees that were rolled back into the loan and tacked onto the principal.

86.   CW6 explained that once customers were over their heads in debt on personal loans, the CitiFinancial salespeople targeted them for a high-rate mortgage as a way to consolidate their debt:  "Once you exhausted all of their options for an unsecured personal loan, once they've already reached the max they can borrow, all they have left is to (take out a mortgage)," he said.  "It was the only way we could extend their payments."  He said steering customers already in CitiFinancial personal

- 29-

loans into high-rate mortgages was a top goal of his job, promoted by his managers. CW6 also observed that some of the mortgages sold by the Bank had balloon payments.

**C.      Minorities in Fact Receive Predatory Loan Terms from Citi**

87.      As discussed herein, Citi's *predatory* loans include:  high-cost loans (*i.e.*, loans with an interest rate that was at least three percentage points above a federally-established benchmark), subprime loans, interest-only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no documentation loans, and/or ARM loans with teaser rates (*i.e.*, lifetime maximum rate > initial rate + 6%).

88.      Data reported by the Bank and available through public databases shows that in 2004-2011, 41.3% of loans made by Citi to African-American and Latino customers in Los Angeles were high cost, but only 14.5% of loans made to white customers in Los Angeles were high cost.  This data demonstrates a pattern of statistically significant[28] differences in the product placement for high-cost loans between minority and white borrowers.[29]

89.      The following map of Citi predatory loans originated in Los Angeles between 2004-2011 illustrates the geographic distribution of predatory loans in African-American and Latino neighborhoods and white neighborhoods in Los Angeles.  This map demonstrates that Citi's predatory loans are disproportionately located in minority neighborhoods.

---

[28] Statistical significance is a measure of probability that an observed outcome would not have occurred by chance. As used in this Complaint, an outcome is statistically significant if the probability that it could have occurred by chance is less than 5%.

[29] As alleged throughout the complaint, all references to the date range 2004-2011 are intended to include the time period up to and including December 31, 2011.

- 30-

1
2
3
4
5
6
7
8
9
10
11
12
13



14

15    **D.    Minorities in Los Angeles Receive Such Predatory Loan Terms from Citi Regardless of Creditworthiness**

16    90.    According to *Discretionary Pricing, Mortgage Discrimination, and the*

17    *Fair Housing Act*, 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV. 375, 398

18    (2010), several studies dating back to 2000 have established that minority borrowers

19    were charged higher interest rates/fees than similar creditworthy white borrowers.

20    91.    Likewise, according to *A Racial Financial Crisis*, 83 TEMPLE LAW REV.

21    941, 947, 949 (2011), one study concluded that "[e]ven after controlling for

22    underwriting variables, African-American borrowers were 6.1% to 34.3% more

23    likely than whites to receive a higher rate subprime mortgage during the subprime

24    boom." And another study found that significant loan pricing disparity exists among

25    low-risk borrowers – African-American borrowers were 65% more likely to receive

26
27
28

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12  658984 V2

a subprime home purchase loan than similar creditworthy white borrowers, and 124% more likely to receive a subprime refinance loan.[30]

92.     Similarly, the Center for Responsible Lending's November 2011 report, *Lost Ground, 2011:  Disparities in Mortgage Lending and Foreclosures,* at 21-22, stated that "racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes."  Further, the Center stated it is "particularly troublesome" that minorities received riskier loans "even within [similar] credit ranges."  For example, among borrowers having FICO scores above 660, the incidence of higher rate loans among various groups was as follows:  whites – 6.2%; African-American – 21.4%; and Latino – 19.3%.

93.     Moreover, data reported by the Bank, and available through both public and private databases, shows that minorities in Los Angeles received predatory loan terms from Citi more frequently than white borrowers, regardless of creditworthiness.

94.     A regression analysis of this data, controlling for borrower race and objective risk characteristics such as credit history, loan-to-value ratio, and the ratio of loan amount to income demonstrates that, from 2004-2011, an African-American borrower was 2.273 times more likely to receive a predatory loan than was a white borrower possessing similar underwriting and borrower characteristics.  The regression analysis further demonstrates that the odds that a Latino borrower would receive a predatory loan were 2.389 times the odds that a white borrower possessing similar underwriting and borrower characteristics would receive a predatory loan.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

---

[30] Center for Responsible Lending, *Unfair Lending:  The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (2006) (internal citation omitted) (*available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-Unfair_Lending-0506.pdf)

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12  658984 V2

95.     The regression analysis also shows that these disparities persist when comparing only borrowers with FICO scores above 660.  An African-American borrower with a FICO score above 660 was 3.050 times more likely to receive a predatory loan as was a white borrower with similar underwriting and borrower characteristics.  A Latino borrower with a FICO score above 660 was 2.614 times more likely to receive a predatory loan as was a white borrower with similar underwriting and borrower characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

96.     A similar regression analysis taking into account the racial makeup of the borrower's neighborhood rather than the individual borrower's race shows that borrowers in heavily minority neighborhoods in Los Angeles were more likely to receive predatory loans than were borrowers in heavily white neighborhoods.  For example, a borrower in a heavily minority census tract (census tract consisting of at least 80% African-American or Latino households) was 4.052 times more likely to receive a predatory loan as was a borrower with similar characteristics in a heavily white neighborhood (census tract with at least 80% white households).  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

97.     This data also establishes that Citi disproportionately issued government loans with higher risk features (FHA/VA) to African-American and Latino borrowers in Los Angeles from 2009-2011.  A regression analysis, controlling for borrower race and objective risk characteristics such as ratio of loan amount to income, demonstrates that an African-American borrower was 3.423 times more likely to receive a higher risk government loan than was a white borrower possessing similar borrower and underwriting characteristics.  The regression analysis further demonstrates that a Latino borrower was 3.448 times more likely to receive a higher

risk government loan than was a white borrower possessing similar borrower and underwriting characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

98.    Thus, the disparities are not the result of, or otherwise explained by, legitimate non-racial underwriting criteria.

**E.    Citi's Targeting of Minorities who in Fact Receive Predatory Loan Terms Regardless of Creditworthiness Causes Foreclosures**

**1.    Data shows that Citi's foreclosures are disproportionately located in minority neighborhoods in Los Angeles.**

99.    Citi has intentionally targeted discriminatory lending practices at African-American and Latino neighborhoods and residents.  Far from being a responsible provider of much-needed credit in minority communities, Citi is a leading cause of stagnation and decline in African-American and Latino neighborhoods where its foreclosures are concentrated.  Specifically, since at least 2000, its foreclosures have been concentrated in neighborhoods with African-American or Latino populations exceeding 80%.

100.    Although only 21.6% of Citi's loan originations in Los Angeles from 2004 to 2011 were in census tracts that are at least 80% African-American or Latino, 27.5% of loan originations that had entered foreclosure by February 2013 were in those census tracts.  Similarly, while only 38.3% of Citi's loan originations in Los Angeles from 2004 to 2011 occurred in census tracts that are at least 50% African-American or Latino, 49.4% of Citi's loan originations that had entered foreclosure by February 2013 were in those census tracts.  Moreover, while 36.1% of Citi's loan originations in Los Angeles from 2004 to 2011 occurred in census tracts that were less than 20% African-American or Latino, only 21.7% of Citi's loan originations that had entered foreclosure by February 2013 were in those census tracts.  This data

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12 658984 V2

demonstrates a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

101.   The following map represents the concentration of Citi's loan originations from 2004 through 2011 that had entered foreclosure by February 2013 in African-American and Latino neighborhoods.  In addition to the disproportionate distribution of Citi foreclosures in African-American and Latino neighborhoods, disparate rates of foreclosure based on race further demonstrate Citi's failure to follow responsible underwriting practices in minority neighborhoods.  While 18.0% of Citi's loans in predominantly (greater than 80%) African-American or Latino neighborhoods result in foreclosure, the same is true for only 4.4% of its loans in predominantly (greater than 80%) white neighborhoods.  In other words, a Citi loan in a predominantly African-American or Latino neighborhood is 4.774 times more likely to result in foreclosure as is a Citi loan in a predominantly white neighborhood.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12  658984 V2



102.    As the above map demonstrates, there is a concentration of Citi foreclosures in African-American and Latino neighborhoods.   Specifically, a Citi loan in a predominantly African-American or Latino neighborhood is 4.774 times more likely to result in foreclosure as is a Citi loan in a predominantly white neighborhood.

103.    Thus, Citi's discretionary lending policies, and pattern or practice of targeting of minorities, who in fact receive predatory loan terms regardless of creditworthiness, have caused and continue to cause foreclosures in Los Angeles.

**2.    Data shows that Citi's loans to minorities result in especially quick foreclosures.**

104.    A comparison of the time from origination to foreclosure of Citi's loans originated in Los Angeles from 2004 to 2011 shows a marked disparity with respect to the speed with which loans to African-Americans and Latinos and whites move into foreclosure.  The average time to foreclosure for African-American borrowers is 2.908 years, and for Latino borrowers is 2.739 years.  By comparison, the average

- 36 -

time to foreclosure for white borrowers is 3.232 years.  These statistically significant disparities demonstrate that Citi aggressively moved minority borrowers into foreclosure, as compared with how the Bank handled foreclosures for white borrowers.

105.   This disparity in time to foreclosure is further evidence that Citi is engaged in lending practices consistent with reverse redlining.  The disparity in time to foreclosure demonstrates that Citi is engaged in irresponsible underwriting in African-American and Latino communities that does not serve the best interests of borrowers.  If Citi were applying the same underwriting practices in African-American and Latino neighborhoods and white neighborhoods in Los Angeles, there would not be a significant difference in time to foreclosure.  Were Citi underwriting borrowers in both communities with equal care and attention to proper underwriting practices, borrowers in African-American and Latino communities would not find themselves in financial straits significantly sooner during the lives of their loans than do borrowers in white communities.  The faster time to foreclosure in African-American and Latino neighborhoods is consistent with underwriting practices in minority communities that are less concerned with determining a borrower's ability to pay and qualifications for the loan than they are in maximizing short-term profit.

106.   The HUD/Treasury Report confirms that time to foreclosure is an important indicator of predatory practices:  "[t]he speed with which the subprime loans in these communities have gone to foreclosure suggests that some lenders may be making mortgage loans to borrowers who did not have the ability to repay those loans at the time of origination."[31]

**3.    Data shows that the discriminatory loan terms cause the foreclosures.**

107.   Citi's discriminatory lending practices cause foreclosures and vacancies in minority communities in Los Angeles.

_____
[31] HUD/Treasury Report at 25.

- 37-

108.   Steering borrowers into loans that are less advantageous than loans for which they qualify, including steering borrowers who qualify for prime loans into subprime loans, can cause foreclosures because the borrowers are required to make higher loan payments.  The difference between what a borrower who is steered in this manner must pay and the lower payments for which the borrower qualified can cause the borrower to be unable to make payments on the mortgage.  In such instances, the borrower would have continued to make payments on the mortgage, and remained in possession of the premises, had Citi made the loan without improperly steering the borrower into a subprime, or less advantageous, loan. Steering borrowers in this manner, therefore, causes foreclosures and vacancies.

109.   Giving a loan to an applicant who does not qualify for the loan, especially a refinance or home equity loan, can also cause foreclosures and vacancies.  Some homeowners live in properties that the borrower owns subject to no mortgage.  Other homeowners live in properties with modest mortgages that they can comfortably afford to pay.  Where a lender, such as Citi, solicits such a homeowner to take out a home equity loan on his or her property or, alternatively, to refinance the existing loan into a larger loan without proper underwriting to assure that the borrower can make the monthly payments for the new, larger loan, the result is likely to be that the homeowner will be unable to make payments on the mortgage.  This is particularly true where the borrower is refinanced from a fixed-rate loan into an adjustable rate loan that the lender knows the borrower cannot afford, should interest rates rise.  In some instances the lender may refinance the borrower into a new loan that the lender knows the borrower cannot sustain, given the borrower's present debt obligations and financial resources.  In such circumstances, the likely result of such practices is to cause homeowners who are otherwise occupying properties without a mortgage, or comfortably making payments on a modest existing mortgage, to be unable to make payments on a new, unaffordable loan.  This, in turn, causes

- 38-

foreclosures and vacancies.  If these unaffordable refinance and home equity loans had not been made, the subject properties would not have become vacant.

110.   A regression analysis of loans issued by Citi in Los Angeles from 2004-2011, controlling for objective risk characteristics such as credit history, loan-to-value ratio, and the ratio of loan amount to income, demonstrates that a predatory loan is 2.051 times more likely to result in foreclosure than is a non-predatory loan.

111.   The regression analysis further demonstrates that a predatory loan in a heavily minority neighborhood (census tract consisting of at least 80% African-American and Latino households) is 5.255 times more likely to result in foreclosure as is a non-predatory loan with similar risk characteristics in a heavily white neighborhood (census tract with at least 80% white households).  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

112.   The regression analysis also demonstrates that a predatory loan made to an African-American borrower was 1.952 times more likely to result in foreclosure than was a non-predatory loan made to a white borrower with similar borrower and underwriting characteristics.  A predatory loan made to a Latino borrower was 2.304 times more likely to result in foreclosure than was a non-predatory loan made to a white borrower with similar risk characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

## VI.   INJURY TO LOS ANGELES CAUSED BY CITI'S DISCRIMINATORY LOAN PRACTICES

113.   Los Angeles has suffered financial injuries as a direct result of Citi's pattern or practice of reverse redlining, and the resulting disproportionately high rate of foreclosure on Citi loans to African-Americans and Latinos in minority neighborhoods in Los Angeles.  Los Angeles seeks redress for these injuries.  The

- 39 -

City does not seek redress in this action for injuries resulting from foreclosures on mortgages originated by lenders other than Citi.

114.   Citi continues to engage in the discriminatory pattern or practice described herein, with similar and continuing deleterious consequences to the City.

115.   The City seeks damages for its reduced property tax revenues, based on: (a) the decreased value of the vacant properties themselves; and (b) the decreased value of properties surrounding the vacant properties.  In addition, the City seeks damages based on municipal services that it still must provide to remedy blight and unsafe and dangerous conditions which exist at vacant properties that were foreclosed as a result of Citi's illegal lending practices.

## A.   Los Angeles Has Been Injured by a Reduction in Property Tax Revenues from Foreclosures Caused by Discriminatory Loans Issued by Citi

116.   As stated in a September 2011 Report by the Alliance of Californians for Community Empowerment and the California Reinvestment Coalition, entitled *The Wall Street Wrecking Ball:  What Foreclosures are Costing Los Angeles Neighborhoods* ("Cost to Los Angeles Report"), "[w]hen a home falls into foreclosure, it affects the property value of the foreclosed home as well as the values of other homes in the neighborhood."  These decreased property values in turn reduce property tax revenues to the City.[32]

117.   "As property values drop an estimated $78.8 billion, Los Angeles communities could lose as much as $481 million in property tax revenue" from the decreased value of the foreclosed homes themselves and those in the surrounding neighborhoods.[33]

---

[32] *Cost to Los Angeles* Report at 3.

[33] *Id.*

- 40-

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12 658984 V2

**1.  The decreased value of the properties foreclosed by Citi result in reduced property tax revenues.**

118.   The *Cost to Los Angeles* Report states that "[i]t is estimated that homes in foreclosure experience a 22% decline in value."[34]

119.   For example, "[t]hat means the impact of the 200,000 foreclosures estimated for the period 2008 through 2012 will be more than $26 billion in lost home value in communities across Los Angeles."[35]   A portion of this lost home value is attributable to homes foreclosed as a result of Citi's discriminatory loan practices.

120.   The decreased property values of foreclosed homes in turn reduce property tax revenues to the City and constitute damages suffered by Los Angeles.

**2.  The decreased value of properties in the neighborhoods surrounding foreclosed properties results in reduced property tax revenues.**

121.   Citi foreclosure properties and the problems associated with them likewise cause especially significant declines in surrounding property values because the neighborhoods become less desirable.  This in turn reduces the property tax revenues collected by Los Angeles.

122.   Property tax losses suffered by Los Angeles as a result of vacancies resulting from Citi's foreclosures are fully capable of empirical quantification.

123.   Routinely maintained property tax and other data allow for the precise calculation of the property tax revenues lost by the City as a direct result of particular Citi foreclosures.  Using a well-established statistical regression technique that focuses on effects on neighboring properties, the City can isolate the lost property value attributable to Citi foreclosures and vacancies from losses attributable to other causes, such as neighborhood conditions.  This technique, known as Hedonic regression, when applied to housing markets, isolates the factors that contribute to the value of a property by studying thousands of housing transactions.  Those factors

---

[34] *Id.*

[35] *Id.*

-41-

include the size of a home, the number of bedrooms and bathrooms, whether the neighborhood is safe, whether neighboring properties are well-maintained, and more. Hedonic analysis determines the contribution of each of these house and neighborhood characteristics to the value of a home.

124.   The number of foreclosures in a neighborhood is one of the neighborhood traits that Hedonic analysis can examine.  Hedonic analysis allows for the calculation of the impact on a property's value of the first foreclosure in close proximity (*e.g.*, ⅛ or ¼ of a mile), the average impact of subsequent foreclosures, and the impact of the last foreclosure.

125.   Foreclosures attributable to Citi in minority neighborhoods in Los Angeles can be analyzed through Hedonic regression to calculate the resulting loss in the property values of nearby homes.  This loss can be distinguished from any loss attributable to non-Citi foreclosures or other causes.  The loss in property value in minority neighborhoods in Los Angeles attributable to Citi's unlawful acts and consequent foreclosures can be used to calculate the City's corresponding loss in property tax revenues.

126.   Various studies establish that Hedonic regression can be used for this purpose.  A study published by the Fannie Mae Foundation, using Chicago as an example, determined that each foreclosure is responsible for an average decline of approximately 1.1% in the value of each single-family home within an eighth of a mile.[36]

127.   Other studies have focused on the impact of abandoned homes on surrounding property values.  A study in Philadelphia, for example, found that each home within 150 feet of an abandoned home declined in value by an average of

---

[36] *See* Dan Immergluck & Geoff Smith, *The External Costs of Foreclosure: The Impact of Single-Family Mortgage Foreclosures on Property Values*, 17 HOUSING POLICY DEBATE 57 (2006) at 69.

- 42-

$7,627; homes within 150 to 299 feet declined in value by $6,810; and homes within 300 to 449 feet declined in value by $3,542.[37]

128.   These studies highlight the foreseeability of tax-related harm to the City as the result of foreclosures arising from discriminatory loans.

129.   And most recently, the *Cost to Los Angeles* Report stated, "[i]t is conservatively estimated that each foreclosed property will cause the value of neighboring homes within an eighth of a mile to drop 0.9%." Thus, "[i]n Los Angeles, impacted homeowners could experience property devaluation of $53 billion." This decreased property value of neighboring homes in turn reduces property tax revenues to the City.

130.   Application of such Hedonic regression methodology to data regularly maintained by Los Angeles can be used to quantify precisely the property tax injury to the City caused by Citi's discriminatory lending practices and resulting foreclosures in minority neighborhoods.

**B.   Los Angeles Is Injured Because It Still Must Provide Costly Municipal Services for Properties in Minority Neighborhoods that Have Become Vacant as a Direct Result of Discriminatory Loans Originated or Purchased by Citi**

131.   Vacant Citi foreclosure properties cause direct costs to the City because the City is required to provide increased municipal services at these properties. These services would not have been necessary if the properties were occupied.

132.   For example, the City's Police Department must send personnel and police vehicles to vacant Citi foreclosure properties to respond to public health and safety threats that arise at these properties because the properties are vacant. Because violent crime has been found to increase 2.33% for every 1% increase in foreclosures, among other services, LAPD must respond to calls reporting suspicious

---

[37] *See* Anne B. Shlay & Gordon Whitman, *Research for Democracy: Linking Community Organizing and Research to Leverage Blight Policy*, at 21 (2004).

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12 658984 V2

activity at vacant properties, and perform ongoing investigations involving criminal activity, including gang activity, at vacant properties.

133.   Likewise, the Code Enforcement Bureau of the Los Angeles Building and Safety Department ("Building and Safety Department") must devote personnel time and out-of-pocket funds to inspect vacant properties and issue orders for violations of the municipal code to be fixed.  When the municipal code violations are not fixed, the Building and Safety Department is required to perform certain services, including, but not limited to, removing excess vegetation at vacant properties, hauling away trash and debris at vacant properties, boarding vacant property from casual entry, putting up fencing to secure vacant properties, putting up fencing to prevent access to swimming pools by young children at vacant properties, coordinating with the Los Angeles County Health Department to chemically treat the pools at vacant properties to prevent mosquitoes from breeding, painting and removing graffiti at vacant properties, condemning and demolishing vacant structures deemed an imminent hazard to public safety, and having vacant properties frequented by gangs declared a public nuisance and demolished on that basis.

134.   As stated by the *Cost to Los Angeles* Report, "[l]ocal government agencies have to spend money and staff time on blighted foreclosed properties, providing maintenance, inspections, trash removal, increased public safety calls, and other code enforcement services …. Responding to these needs is a gargantuan task that involves multiple agencies and multiple levels of local government."[38]

135.   Moreover, as discussed above, the Apgar-Duda report underscores the foreseeability of municipal costs as the result of foreclosures arising from discriminatory loans.

---

[38] *Id*. at 3.

## VII.   SAMPLE FORECLOSURE PROPERTIES IN THE CITY OF LOS ANGELES

136.   Plaintiff has already identified one thousand two hundred (1,200) discriminatory loans issued by Citi in Los Angeles between 2004-2011 that resulted in foreclosure.[39]  The City has already incurred, or will incur in the future, damages corresponding to each of these properties.  A sample of property addresses corresponding to these foreclosures is set forth below:

117 W. 45th St., 90037

9603 Gullo Ave., 91331

1200 E. 34th St., 90011

7934 Clearfield Ave., 91402

3891 3rd Ave., 90008

7706 Loma Verde Ave., 91304

6911 Ethel Ave., 91605

8727 Tilden Ave., 91402

1138 N. Chicago St., 90033

1009 Nolden St., 90042

## VIII.  STATUTE OF LIMITATIONS AND CONTINUING VIOLATIONS DOCTRINE

137.   As alleged herein, Defendant Citi has engaged in a continuous pattern and practice of mortgage discrimination in Los Angeles since at least 2002 by

[39] Plaintiff anticipates that it will be able to identify significantly more foreclosures resulting from the issuance of discriminatory loans during this time period with the benefit of discovery.  This conclusion derives from the fact that, because of certain reporting limitations, the publicly-available mortgage loan databases utilized by Plaintiff are not as comprehensive as the mortgage loan databases maintained by, and in the possession of, an issuing bank.

- 45-

imposing different terms or conditions on a discriminatory and legally prohibited basis.  In order to maximize profits at the expense of the City of Los Angeles and minority borrowers, Citi adapted its unlawful discrimination to changing market conditions.  This unlawful pattern and practice conduct is continuing through the present and has not terminated.  Therefore, the operative statute of limitations governing actions brought pursuant to the Federal Fair Housing Act has not commenced to run.

## IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*)

138.    Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

139.    Citi's acts, policies, and practices as described herein constitute intentional discrimination on the basis of race.  Citi has intentionally targeted residents of predominantly African-American and Latino neighborhoods in Los Angeles for different treatment than residents of predominantly white neighborhoods in Los Angeles with respect to mortgage lending.  Citi has intentionally targeted residents of these neighborhoods for high-cost loans without regard to their credit qualifications and without regard to whether they qualify for more advantageous loans, including prime loans.  Citi has intentionally targeted residents of these neighborhoods for increased interest rates, points, and fees, and for other disadvantageous loan terms, including, but not limited to, adjustable rates, prepayment penalties, and balloon payments.  Citi has intentionally targeted residents of these neighborhoods for unfair and deceptive lending practices in connection with marketing and underwriting mortgage loans.

140.    Citi's acts, policies, and practices have had an adverse and disproportionate impact on African-Americans and Latinos and residents of

- 46-

predominantly African-American and Latino neighborhoods in Los Angeles as compared to similarly situated whites and residents of predominantly white neighborhoods in Los Angeles. This adverse and disproportionate impact is the direct result of Citi's policies of providing discretion to loan officers and others responsible for mortgage lending; failing to monitor this discretion to ensure that borrowers were being placed in loan products on a nondiscriminatory basis when Citi had notice of widespread product placement disparities based on race and national origin; giving loan officers and others responsible for mortgage lending large financial incentives to issue loans to African-Americans and Latinos that are costlier than better loans for which they qualify; otherwise encouraging and directing loan officers and others responsible for mortgage lending to steer borrowers into high-cost loans or loans with adjustable rates, prepayment penalties, or balloon payments without regard for whether they qualify for better loans, including but not limited to prime loans; and setting interest rate caps. These policies have caused African-Americans and Latinos and residents of predominantly African-American and Latino neighborhoods in Los Angeles to receive mortgage loans from Citi that have materially less favorable terms than mortgage loans given by Citi to similarly situated whites and residents of predominantly white neighborhoods in Los Angeles, and that are materially more likely to result in foreclosure.

141. Citi's residential lending-related acts, policies, and practices constitute reverse redlining and violate the Fair Housing Act as:

(a) Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of 42 U.S.C. § 3605(a); and

(b) Discrimination on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling, in violation of 42 U.S.C. § 3604(b).

- 47-

142.   Citi's policies or practices are not justified by business necessity or legitimate business interests.

143.   Citi's policies and practices are continuing.

144.   The City is an aggrieved person as defined by 42 U.S.C. § 3602(i) and has suffered damages as a result of Citi's conduct.

145.   The City's damages include lost tax revenues and the need to provide increased municipal services.  The loss of tax revenues at specific foreclosure sites and at closely neighboring properties in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to Citi's discriminatory lending.  Likewise, the need to provide increased municipal services at blighted foreclosure sites in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to Citi's discriminatory lending.

146.   Citi's policies and practices, as described herein, had the purpose and effect of discriminating on the basis of race or national origin.  These policies and practices were intentional, willful, or implemented with reckless disregard for the rights of African-American and Latino borrowers.

## SECOND CLAIM FOR RELIEF

### (Common Law Claim For Restitution Based On California Law)

147.   Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

148.   As a direct and proximate result of Defendants' predatory lending practices, Defendant has been enriched at Plaintiff's expense.  Defendants have failed to remit those wrongfully obtained benefits or reimburse the City for its costs improperly caused by Defendants, and retention of the benefits by Defendants would be unjust without payment.

-48-

149.   In addition, to its detriment the City has paid for the Defendants' externalities, or Defendants' costs of harm caused by its mortgage lending discrimination, in circumstances where Defendants are and have been aware of this obvious benefit and retention of such benefit would be unjust.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), the City demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the City respectfully prays that the Court grant it the following relief:

A.   Enter a declaratory judgment that the foregoing acts, policies, and practices of Citi violate 42 U.S.C. §§ 3604 and 3605;

B.   Enter a permanent injunction enjoining Citi and its directors, officers, agents, and employees from continuing the discriminatory conduct described herein, and directing Citi and its directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the discriminatory conduct described herein, and to prevent additional instances of such conduct or similar conduct from occurring in the future, pursuant to 42 U.S.C. § 3613(c)(1);

C.   Award compensatory damages to the City in an amount to be determined by the jury that would fully compensate the City of Los Angeles for its injuries caused by the conduct of Citi alleged herein, pursuant to 42 U.S.C. § 3613(c)(1);

D.   Award punitive damages to the City in an amount to be determined by the jury that would punish Citi for the willful, wanton, and reckless conduct alleged herein, and that would effectively deter similar conduct in the future, pursuant to 42 U.S.C. § 3613(c)(1);

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12  658984 V2

1        E.      Award the City its reasonable attorneys' fees and costs, pursuant to 42

2   U.S.C. § 3613(c)(2);

3        F.      Require payment of pre-judgment interest on monetary damages; and

4        G.      Order such other relief as this Court deems just and equitable.

5   DATED:  December 5, 2013

By _____

Michael N. Feuer (SBN 111529)
City Attorney
CITY OF LOS ANGELES
200 N. Main Street, Room 800
Los Angeles, CA 90012
Phone: (213) 978-8100
Mike.feuer@lacity.org

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
steve@hbsslaw.com

Elaine T. Byszewski (SBN 222304)
Lee M. Gordon (SBN 174168)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA  91101
Telephone:  (213) 330-7150
elaine@hbsslaw.com
lee@hbsslaw.com

Joel Liberson (SBN 164857)
Howard Liberson (SBN 183269)
TRIAL & APPELLATE RESOURCES, P.C.
400 Continental Blvd., 6th Floor
El Segundo, CA  90245
Telephone:  (310) 426-2361
joel@taresources.com
howard@taresources.com

- 50 -

Robert Peck
CENTER FOR CONSTITUTIONAL
LITIGATION
777 6th Street NW, Suite 520
Washington, DC  20001
Telephone:  (202) 944-2803
Robert.peck@cclfirm.com

Clifton Albright (SBN 100020)
ALBRIGHT YEE & SCHMIT
888 West 6th Street, Suite 1400
Los Angeles, CA  90017
Telephone: (213) 833-1700
clifton.albright@ayslaw.com

*Attorneys for Plaintiff the City of Los Angeles*

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12  658984 V2

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Stephen V. Wilson _____ and the assigned Magistrate Judge is _____ Jacqueline Chooljian _____ .

The case number on all documents filed with the Court should read as follows:

## 2:13-cv-09009-SVW(JCx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____ December 5, 2013 _____

Date

By  APEDRO _____

Deputy Clerk

---

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| | | |
|---|---|---|
| [x] **Western Division** 312 N. Spring Street, G-8 Los Angeles, CA 90012 | [ ] **Southern Division** 411 West Fourth St., Ste 1053 Santa Ana, CA 92701 | [ ] **Eastern Division** 3470 Twelfth Street, Room 134 Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

---

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| CITY OF LOS ANGELES, a municipal corporation, | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) Civil Action No. CV13-09009-SUW(JCx) |
| CITIGROUP INC.; CITIBANK, N.A.; | ) |
| CITIMORTGAGE, INC.; CITICORP TRUST BANK, | ) |
| FSB; and CITI HOLDINGS, INC. | ) |
| | ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

TO: _(Defendant's name and address)_

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Elaine T. Byszewski
Lee M. Gordon
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Ave., Suite 203
Pasadena, CA 91101

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: 12/5/2013

Signature of Clerk or Deputy Clerk

1202

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| **I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ ) | **DEFENDANTS** ( Check box if you are representing yourself ☐ ) |
|---|---|
| CITY OF LOS ANGELES, a municipal corporation | CITIGROUP INC.; CITIBANK, N.A.; CITIMORTGAGE, INC.; CITICORP TRUST BANK, FSB; and CITI HOLDINGS, INC. |

| **(b) County of Residence of First Listed Plaintiff**   LOS ANGELES, CA | **County of Residence of First Listed Defendant** _____ |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| **(c) Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.<br>Michael Feuer (SBN 111529)<br>City Attorney, CITY OF LOS ANGELES<br>200 N. Main Street, Room 800<br>Los Angeles CA 90012, (213) 978-8100 | **Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. |
|---|---|

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Federal Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. Seeking redress for injuries caused by pattern or practice of illegal and discriminatory mortgage lending.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY/CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☒ 443 Housing/Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

| **FOR OFFICE USE ONLY:** Case Number: CV13-09009 | |
|---|---|
| CV-71 (11/13) | CIVIL COVER SHEET | Page 1 of 3 |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes ☒ No | ☐ Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF? Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT? Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| ☐ Yes ☒ No | ☐ Los Angeles | ☐ Los Angeles | Western |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| Indicate the location in which a majority of claims arose: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | WESTERN |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court** and dismissed, remanded or closed?    ☒ NO    ☐ YES

    If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed **in this court** that are related to the present case?    ☒ NO    ☐ YES

    If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)    ☐ A. Arise from the same or closely related transactions, happenings, or events; or

    ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

    ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

    ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _[signature]_    DATE: 12/5/13

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |