1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MAYER BROWN LLP**
BRONWYN F. POLLOCK (SBN 210912)
 *bpollock@mayerbrown.com*
EVAN M. WOOTEN (SBN 247340)
 *ewooten@mayerbrown.com*
350 South Grand Avenue, 25th Floor
Los Angeles, CA  90071-1503
Telephone:  (213) 229-9500
Facsimile:   (213) 625-0248

LUCIA NALE (*Pro Hac Vice*)
 *lnale@mayerbrown.com*
DEBRA BOGO-ERNST (*Pro Hac Vice*)
 *dernst@mayerbrown.com*
71 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 782-0600
Facsimile:  (312) 701-7711

Attorneys for Defendants
CITIGROUP INC.; CITIBANK, N.A.;
CITIMORTGAGE, INC.; CITICORP TRUST BANK, FSB;
and CITI HOLDINGS, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF LOS ANGELES, a municipal corporation,<br><br>                    Plaintiff,<br><br>        v.<br><br>CITIGROUP INC.; CITIBANK, N.A.; CITIMORTGAGE, INC.; CITICORP TRUST BANK, FSB; and CITI HOLDINGS, INC.,<br><br>                    Defendants. | Case No. 13-cv-09009-SVW (JCx)<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**<br><br>Date:    June 2, 2014<br>Time:   1:30 p.m.<br>Judge:  The Hon. Stephen V. Wilson |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

BACKGROUND ................................................................................. 4

    A.    The LA County Assessor Does Not Consider Foreclosure Sales Prices In Determining Property Assessments ........................................ 4

    B.    LA's Property Tax Revenue Has Increased While Its Municipal Expenditures Have Decreased ...................................................... 5

    C.    The Properties Identified in the Complaint Undermine LA's Theory ........ 7

ARGUMENT ...................................................................................... 8

I.    The Complaint Should Be Dismissed Because LA Lacks Standing ..................... 8

    A.    The Complaint Does Not Adequately Allege Injury .................................. 8

    B.    The Complaint Does Not Adequately Allege Causation ........................... 11

II.    The Complaint Should Be Dismissed Because It Fails To State A Claim .......... 15

    A.    The FHA Claim (Count I) Fails As A Matter Of Law .............................. 15

        1.    The statute of limitations bars LA's claim ..................................... 15

        2.    LA's allegations are insufficient to support an FHA claim ............. 19

    B.    The Restitution Claim (Count II) Fails As A Matter Of Law ................... 23

    C.    The Punitive Damages and Injunctive Relief Requests Fail ..................... 24

III.    The Complaint Should Be Dismissed Because It Violates Rule 8 ...................... 24

CONCLUSION .................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alston v. Advanced Brands & Importing Co.*,
494 F.3d 562 (6th Cir. 2007)................................................................... 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................15, 16, 20, 21

*Beck v. Cnty. of Riverside*,
2007 WL 1345849 (Cal. Ct. App. May 7, 2007) (unpublished)................................ 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................15, 24

*Bikle v. Doe 1-9*,
2013 WL 3878976 (C.D. Cal. July 26, 2013) ........................................... 24

*Bitsakis v. JPMorgan Chase Bank*,
2012 WL 359283 (C.D. Cal. Feb. 1, 2012) ............................................. 23

*Budnick v. Town of Carefree*,
518 F.3d 1109 (9th Cir. 2008).......................................................... 22

*Chandler v. State Farm*,
598 F.3d 1115 (9th Cir. 2010)........................................................... 8

*Cherosky v. Henderson*,
330 F.3d 1243 (9th Cir. 2003)......................................................16, 18

*City & Cnty. of S.F. v. Philip Morris, Inc.*,
957 F. Supp. 1130 (N.D. Cal. 1997).................................................... 23

*City of Birmingham v. Citigroup Inc.*,
2009 WL 8652915 (N.D. Ala. Aug. 19, 2009) ........................................1, 12, 13, 19

*City of Cleveland v. Ameriquest Mortg. Sec.*,
621 F. Supp. 2d 513 (N.D. Ohio 2009),
*aff'd*, 615 F.3d 496 (6th Cir. 2010) ........................................1, 12, 14, 15

*City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*,
719 F.2d 322 (9th Cir. 1983).......................................................... 10

*City of Memphis v. Wells Fargo*,
2011 WL 1706756 (W.D. Tenn. May 4, 2011) ...........................................2, 11, 19

*Daniels v. UPS*,
701 F.3d 620 (10th Cir. 2012)......................................................... 17

*Deirmenjian v. Deutsche Bank*,
526 F. Supp. 2d 1068 (C.D. Cal. 2007).................................................. 23

ii

*DeKalb Cnty. v. HSBC N. Am. Holdings*,
   No. 12-3640, Dkt. 23 (N.D. Ga. Sept. 25, 2013) ............................................ 2

*Doe I v. Wal-Mart Stores*,
   572 F.3d 677 (9th Cir. 2009) ....................................................................... 23

*Douglas v. Cal. Dep't of Youth Auth.*,
   271 F.3d 812 (9th Cir. 2001) ....................................................................... 19

*Egbert v. Sw. Coll. Servs.*,
   2013 WL 3188850 (C.D. Cal. June 21, 2013) ............................................ 24

*Favila v. Katten Muchin Rosenman LLP*,
   188 Cal. App. 4th 189 (2010) ..................................................................... 23

*Federer v. Midland Mortg. Co.*,
   2012 WL 5880916 (N.D. Ga. Nov. 21, 2012) ............................................ 18

*Gamble v. City of Escondido*,
   104 F.3d 300 (9th Cir. 1997) ....................................................................... 20

*Garcia v. Brockway*,
   526 F.3d 456 (9th Cir. 2008) ............................................................17, 18, 23

*Gladstone v. Vill. of Bellwood*,
   441 U.S. 91 (1979) ......................................................................................... 9

*Grant v. Aurora Loan Servs.*,
   736 F. Supp. 2d 1257 (C.D. Cal. 2010) ........................................................ 5

*Grimes v. Fremont Gen. Corp.*,
   785 F. Supp. 2d 269 (S.D.N.Y. 2011) ........................................................ 18

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ..................................................................................... 17

*Hipp v. Liberty Nat'l Life Ins. Co.*,
   252 F.3d 1208 (11th Cir. 2001) ................................................................... 19

*Humphrey v. Citibank, N.A.*,
   2013 WL 5407195 (N.D. Miss. Sept. 25, 2013) ....................................18, 20

*Kaing v. Pulte Homes*,
   2010 WL 625365 (N.D. Cal. Feb. 18, 2010) .............................................. 13

*Kelley v. Corr. Corp.*,
   750 F. Supp. 2d 1132 (E.D. Cal. 2010) ...................................................... 24

*Keohane v. United States*,
   669 F.3d 325 (D.C. Cir. 2012) .................................................................... 16

*Knox v. Davis*,
   260 F.3d 1009 (9th Cir. 2001) ..............................................................16, 18, 19

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...............................................................................8, 9, 11

iii

*Lyons v. England,*
    307 F.3d 1092 (9th Cir. 2002)....................................................................... 18

*Maya v. Centex Corp.,*
    658 F.3d 1060 (9th Cir. 2011)....................................................................... 12

*Mayor of Balt. v. Wells Fargo,*
    677 F. Supp. 2d 847 (D. Md. 2010)..................................................1, 2, 11, 14

*McFadden v. Deutsche Bank Nat'l Trust,*
    2011 WL 3606797 (E.D. Cal. Aug. 16, 2011)............................................... 25

*McHenry v. Renne,*
    84 F.3d 1172 (9th Cir. 1996)......................................................................... 24

*Mindlab Media v. LWRC Int'l,*
    2012 WL 386695 (C.D. Cal. Feb. 6, 2012) ................................................... 25

*Munoz v. MacMillan,*
    195 Cal. App. 4th 648 (2011)........................................................................ 23

*Nat'l R.R. Passenger Corp. v. Morgan,*
    536 U.S. 101 (2002)................................................................................16, 17

*Plumleigh v. City of Santa Ana,*
    754 F. Supp. 2d 1201 (C.D. Cal. 2010) ........................................................ 23

*Prawoto v. PrimeLending,*
    720 F. Supp. 2d 1149 (C.D. Cal. 2010) ........................................................ 15

*S. Cal. Hous. Rights Ctr. v. Krug,*
    564 F. Supp. 2d 1138 (C.D. Cal. 2007) ........................................................ 24

*Silvas v. G.E. Money Bank,*
    449 F. App'x 641 (9th Cir. 2011)..............................................................15, 17

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976)........................................................................................ 12

*Smith v. City of Jackson,*
    544 U.S. 228 (2005)..................................................................................21, 22

*Twp. of Mt. Holly v. Mt. Holly Gardens Citizens,*
    133 S. Ct. 2824 (2013).................................................................................. 22

*Wal-Mart Stores v. Dukes,*
    131 S. Ct. 2541 (2011).................................................................................. 22

*Walton v. Wells Fargo Bank,*
    2013 WL 3177888 (D. Md. June 21, 2013) .................................................. 17

*Warth v. Seldin,*
    422 U.S. 490 (1975)................................................................................1, 9, 10

*Watson v. Ft. Worth Bank & Trust,*
    487 U.S. 977 (1988)...................................................................................... 22

iv

*Wilmshurst v. Lockyer,*
   2006 WL 1409444 (E.D. Cal. May 19, 2006) ......................................... 16

*Woodworth v. Bank of Am.,*
   2011 WL 1540358 (D. Or. Mar. 23, 2011) ............................................... 21

STATUTES

42 U.S.C. § 3604(a) ........................................................................................ 21

42 U.S.C. § 3605(b) ........................................................................................ 21

42 U.S.C. § 3613(a)(1)(A) .............................................................................. 15

Cal. Civ. Code § 2924.11(d) ............................................................................. 7

Cal. Civ. Pro. Code § 339(1) .......................................................................... 23

Cal. Rev. & Tax Code § 96.1 ............................................................................ 5

Cal. Rev. & Tax Code § 110(a) ......................................................................... 5

Fed. R. Civ. P. 8 ......................................................................................1, 4, 24

Fed. R. Civ. P. 12(b)(1) ................................................................................ 1, 8

Fed. R. Civ. P. 12(b)(6) ........................................................................ 1, 3, 15

OTHER AUTHORITIES

Cal. Const. Art. 13 § 1 ................................................................................... 10

Cal. Const. Art. 13A § 2(b) .......................................................................... 8, 5

Dec., Exs. 4 ....................................................................................................... 7

L.A. Municipal Code §§ 21.9.2-21.9.8 .......................................................... 10

Marll, *Do Municipalities Have Article III Standing to Sue Mortgage Lenders Under the Fair Housing Act?* ......................................................................................... 3

U. Pa. J. Bus. L. 253, 299 (2012) ...................................................................... 3

### **INTRODUCTION**

The City of Los Angeles ("LA") seeks through this lawsuit to recoup alleged decreased property tax revenue and increased municipal-services costs from defendants Citigroup Inc., Citibank, N.A., CitiMortgage, Inc., CitiCorp Trust Bank, FSB, and Citi Holdings, Inc. (collectively defined in the complaint as "Citi").  Asserting claims under the Fair Housing Act ("FHA") and for restitution, the complaint alleges that Citi engaged in (a) "reverse redlining" by purportedly issuing mortgage loans on "predatory" terms to minority borrowers in LA and (b) "redlining" by purportedly refusing to refinance minority borrowers' loans.  The complaint contends that these alleged practices resulted in foreclosures, property vacancies, and declines in the value of foreclosed and nearby properties, which in turn allegedly reduced LA's property tax revenue and necessitated expenditures to maintain vacant properties.  For reasons explained below, the complaint should be dismissed for lack of standing under Fed. R. Civ. P. 12(b)(1), for failure to state a claim under Fed. R. Civ. P. 12(b)(6), and for violating Fed. R. Civ. P. 8.

Courts have dismissed similar lawsuits against Citi and other lenders for lack of standing.  *See City of Birmingham v. Citigroup Inc.*, 2009 WL 8652915 (N.D. Ala. Aug. 19, 2009); *Mayor of Balt. v. Wells Fargo*, 677 F. Supp. 2d 847 (D. Md. 2010); *see also City of Cleveland v. Ameriquest Mortg. Sec.*, 621 F. Supp. 2d 513 (N.D. Ohio 2009), *aff'd*, 615 F.3d 496 (6th Cir. 2010).  These courts have emphasized that a complaint must allege "specific, concrete facts" showing that the defendant caused plaintiff's alleged injury.  *Warth v. Seldin*, 422 U.S. 490, 501 (1975).  Here, the complaint simply lists ten of the 1,200 unidentified addresses where LA contends that Citi-issued loans resulted in foreclosure, and states that LA has incurred "or will incur" damages "corresponding to" these properties.  Compl. ¶ 136.  But this is not a class action, so LA may not merely assert that its lawsuit implicates 1,200 properties without providing specific factual allegations showing that those properties were subject to discriminatory loans that harmed LA.

As for the ten identified properties, the complaint offers no specifics whatsoever. It provides no explanation why the corresponding loans were "discriminatory" or even if they were issued to minority borrowers.  It does not say whether Citi played any role in the alleged foreclosures or whether the foreclosures resulted in vacant properties.  And it neither alleges that LA received less property tax revenue due to the foreclosures nor identifies a single dollar spent maintaining the properties.  This is far from the specific allegations required to establish standing.[1]

Moreover, the complaint's theory that Citi's lending practices caused LA to receive less property tax revenue and incur more property maintenance costs is far too attenuated, implicating discretionary decisions by countless third parties.  For example, the borrower must default due to purportedly discriminatory terms in a Citi-issued loan rather than unemployment in the midst of the worst recession since the Great Depression. The owner of the loan at the time of default—which the complaint concedes generally was not Citi—must foreclose.  The buyer at the foreclosure sale must keep the property vacant and allow it to deteriorate, requiring LA to maintain it.  The LA County Assessor must reduce its assessment of the foreclosed property and nearby properties due to the foreclosure rather than the housing slump or other causes—even though the Assessor may not use a foreclosure sale price in setting property values.  The LA County Auditor-Controller must decrease LA's allocation of property tax revenue distributed to hundreds of entities in the County.  And all of this must be disaggregated from the far larger number of foreclosures initiated by the County or other lenders.  Indeed, LA has filed similar lawsuits against Bank of America and Wells Fargo alleging that *their* lending practices caused the very *same* purported injuries that LA asserts here.  *L.A. v. Bank of Am.*, No. 13-9046 (C.D. Cal.); *L.A. v. Wells Fargo*, No. 13-9007 (C.D. Cal.).

---

[1] By contrast, most courts that allowed similar FHA suits to proceed did so only when they were limited to "specific costs" incurred on "specific properties."  *City of Memphis v. Wells Fargo*, 2011 WL 1706756, at \*9 (W.D. Tenn. May 4, 2011); *accord Balt.*, 2011 WL 1557759 (D. Md. Apr. 22, 2011); *compare DeKalb Cnty. v. HSBC N. Am. Holdings*, No. 12-3640, Dkt. 23 (N.D. Ga. Sept. 25, 2013).

In short, if LA could use this "Rube Goldberg-esque theory," then "[a]ny city that sustained a loss of tax revenue that could theoretically be traced back to the bursting of the housing bubble would be entitled to gain access to the federal courts through a direct suit against financial institutions."  Marll, *Do Municipalities Have Article III Standing to Sue Mortgage Lenders Under the Fair Housing Act?*, 15 U. Pa. J. Bus. L. 253, 299 (2012).  LA's theory should be rejected.

Beyond standing, LA's claims fail under Rule 12(b)(6).  LA's claims are subject to a two-year statute of limitations, starting when the loan originates.  LA filed its complaint in December 2013, but does not identify a single loan originated by Citi in the preceding two years.  LA instead cites the continuing violations doctrine, arguing that the limitations period has not even begun to run on conduct dating back to 2002.  But the continuing violations doctrine applies only when a violation does not become actionable until it is repeated during the limitations period.  The doctrine thus does not apply here because the complaint fails to identify a specific violation that occurred since December 2011.  In any event, the doctrine does not permit LA to sit on its hands for over a decade: each allegedly discriminatory loan is a discrete act upon which suit must be brought within two years.

Even if the FHA claim were timely, LA has not plausibly alleged disparate treatment or disparate impact.  As for disparate treatment, the complaint tries to plead the requisite discriminatory intent by citing "confidential witnesses" who purportedly worked for Citi or its outside vendors.  But the alleged witness statements at most assert only that Citi tried to direct *all* customers into subprime loans, regardless of their race.  As for disparate impact, the complaint fails to identify a specific Citi policy, much less a policy that caused the alleged racial disparity.

LA's restitution claim also would fail even if it were timely.  First, restitution is a remedy, not a cause of action.  Second, the complaint does not plausibly allege an essential element of restitution: that LA conferred a benefit on Citi.  LA's alleged lost property tax revenue does not help Citi, and LA does not allege that Citi owned any

1  vacant property when LA expended resources to maintain it.

2      Finally, the complaint violates Rule 8.  Where, as here, a complaint names multiple

3  defendants, it must identify the basis for each defendant's liability.  LA does not even try

4  to do that, instead asserting that defendants are the "agents" of one another.  LA fails,

5  however, to offer any factual allegations in support of its assertion.  Its conclusory

6  attempt to plead agency should thus be rejected.

7                                **BACKGROUND**

8      The complaint alleges that Citi has engaged in two forms of lending

9  discrimination.[2]  First, the complaint asserts that Citi engaged in "redlining" by "refusing

10  to extend credit to minority borrowers."  Compl. ¶ 4.  Second, the complaint contends

11  that Citi "change[d]" its lending practices in the late 1990s, when it purportedly began

12  engaging in "reverse redlining" by "flood[ing]" minority communities with credit

13  containing "predatory" terms.  *Id.* ¶ 5.  And beginning in 2007, Citi allegedly refused to

14  provide credit to minorities while "[s]imultaneously" providing too much credit to

15  minorities "on predatory terms."  *Id.* ¶ 8.  The complaint makes no specific allegation

16  about Citi's practices from December 2011 to the present.

17      The complaint attempts to tie this alleged discrimination to LA's interests in two

18  ways: purportedly discriminatory terms in Citi-issued loans caused borrowers to default,

19  causing the loans' various owners to foreclose, causing the properties to become vacant,

20  causing the value of the foreclosed and nearby properties to decrease, causing increased

21  crime and other issues, causing LA to (a) receive less property tax revenue and (b) spend

22  more money on municipal services.  *Id.* ¶ 17.

23  **A.    The LA County Assessor Does Not Consider Foreclosure Sales Prices In**

24        **Determining Property Assessments.**

25      When a property changes ownership, the LA County Assessor must estimate "the

26  amount of cash … that property would bring if exposed for sale in the open market under

27  ───────────────

28  [2]  For purposes of this motion to dismiss, Citi is forced to treat LA's allegations as true.
    However, Citi expressly denies all of LA's claims.

conditions in which neither the buyer nor seller could take advantage of the exigencies of the other." Cal. Rev. & Tax Code § 110(a). Because a foreclosure sale "is not such a transaction," a foreclosure sale price "'is not deemed the equivalent of'" the property's assessed value, requiring the Assessor to use comparable sales instead. *Beck v. Cnty. of Riverside*, 2007 WL 1345849, at *3 (Cal. Ct. App. May 7, 2007) (unpublished); *see Grant v. Aurora Loan Servs.*, 736 F. Supp. 2d 1257, 1272 n.53 (C.D. Cal. 2010). Following the initial assessment and while the property owner remains constant, the annual assessment may be decreased to reflect a "decline in value" or increased by the lesser of 2% or the rate of inflation. Cal. Const. Art. 13A § 2(b). This process continues until the property is sold, when the Assessor recalculates the property's value using comparable sales.

After the LA County Assessor assigns property values, the County Auditor-Controller determines the amount of taxes owed, the County Treasurer collects payment, and the Auditor-Controller allocates the revenue to entities within the County. Cal. Rev. & Tax Code § 96.1; Declaration of Bronwyn F. Pollock ("Pollock Dec."), Ex. 1 at 13; *see* Request for Judicial Notice. In LA County, the Auditor-Controller is responsible for allocating property tax revenue to 88 cities and hundreds of additional entities. Pollock Dec., Ex. 1 at 13, 16-19.

**B.   LA's Property Tax Revenue Has Increased While Its Municipal Expenditures Have Decreased.**

Contrary to LA's theory here, the revenue paid by the County to LA has *increased* substantially over the last 15 years. In 1999, LA received about $500 million in property tax revenue from the County. *Id.*, Ex. 2 at 340. That amount increased each year through 2009, when LA received over $1.5 billion in property tax revenue—a 200% increase from the amount that it received just ten years earlier. *Id.*, Ex. 7 at 384. In 2010, LA's property tax revenue decreased about 5% from its 2009 high to $1.44 billion, remaining steady through 2011 and increasing again in 2012. *Id.* LA estimates that it will again receive over $1.5 billion in property tax revenue in 2013 and will hit a new high of $1.54

1    billion in 2014. *Id.*

2       Before filing this lawsuit, LA publicly blamed its temporarily-reduced tax revenue

3 on what it called "the most severe economic downturn since the Great Depression." *Id.*,

4 Ex. 8 at 8. As LA explained, "City revenue is linked to the economy." *Id.*, Ex. 12 at 2.

5 Thus, in 2008, then-Mayor Villaraigosa attributed LA's worsening financial condition "to

6 macroeconomic factors." *Id.*, Ex. 11 at 1. For example, LA's unemployment rate

7 surpassed national and state averages from 2009 through 2011, hitting 14.5% in 2010 and

8 exceeding 20% in some areas. *Id.*, Exs. 8 at 10; 9 at 1, 7; 10 at 12. LA's 2010 and 2011

9 budgets therefore cited the "economic downturn," not mortgage lending practices, as the

10 cause of its "falling revenues." *Id.*, Exs. 9 at 1; 10 at 4. And contrary to LA's attempt

11 here to single out lending practices as the cause of its financial woes, LA observed in its

12 2009 budget that "evidence of economic decline can be seen throughout the economy,"

13 with "housing" only "a lesser contributor." *Id.*, Ex. 3 at 333, 335. LA acknowledged that

14 "[t]he recession" affected not just property tax revenue, but "the majority of the City's

15 revenue categories." *Id.*, Ex. 13. These public pronouncements refute LA's attempt to

16 blame its problems on one mortgage lender.

17       Indeed, far from blaming Citi for its budgetary problems, before filing this lawsuit,

18 LA recognized that Citi is a leader in spurring economic development in LA's minority

19 communities. In 2013, for example, then-Mayor Villaraigosa awarded Citi Community

20 Development with the Corporate Innovator of the Year Award in recognition of its efforts

21 empowering minority-owned small businesses in the real estate services field. *Id.*, Ex.

22 15. An LA Councilmember explained that Citi's work "not only reduces blight, it goes

23 even further by creating jobs and supporting minority-owned small businesses in Los

24 Angeles." *Id.*

25       Moreover, the complaint identifies two departments that allegedly incurred

26 increased costs due to vacant properties following foreclosures on Citi-originated loans:

27 the Department of Building Safety and the Police Department. Compl. ¶¶ 132-33. LA's

28 budgetary documents show, however, that those departments *decreased* their

1 | expenditures since the onset of the recession. Indeed, neither department has spent as

2 | much money as it did during the 2008-09 fiscal year. Pollock Dec., Exs. 4 at 42, 123; 5

3 | at 45, 128; 6 at 62, 149.

4 |     **C.    The Properties Identified in the Complaint Undermine LA's Theory**.

5 |     The complaint identifies addresses for ten of the 1,200 allegedly discriminatory

6 | loans. Compl. ¶ 136. Public records reveal the following information about those ten

7 | properties:

8 |     • Loans on the properties issued by Citi or an entity for which Citi allegedly is

9 | responsible all originated between 2005 and 2007—well outside the statute of limitations

10 | governing LA's claims. Pollock Dec., Exs. 16-25.

11 |     • Six of the properties were not foreclosed upon. *Id.* ¶¶ 27-32 & Exs. 26-31.

12 | Those properties thus cannot have caused the harms alleged in the complaint.

13 |     • Of the six loans that were not foreclosed upon, four have recorded grant deeds

14 | transferring the property to a third party. *Id.*, Exs. 26-29. The other two have recorded

15 | notices of rescission of default (*id.*, Exs. 30-31), indicating that those borrowers entered

16 | into "a permanent foreclosure prevention alternative." Cal. Civ. Code § 2924.11(d).

17 |     • The four loans that were foreclosed upon have all been sold to third-party

18 | borrowers subject to new loans. Pollock Dec., Exs. 32-35.

19 |     • Consistent with the onset of the recession, the County Assessor reduced the

20 | assessment for each of the ten properties in 2008 or 2009. *See id.*, Exs. 36-45. The

21 | County Assessor did so even though only one property was foreclosed upon before 2010,

22 | refuting the notion that foreclosures caused the reductions. For example, despite the lack

23 | of a preceding foreclosure, the County Assessor reduced the value of 117 W. 45th Street

24 | from $378,705 in 2007 to $198,100 in 2008; 6911 Ethel Avenue from $505,133 in 2007

25 | to $327,100 in 2008; and 1009 Nolden Street from $523,175 in 2008 to $325,000 in

26 | 2009. *Id.*, Exs. 36, 42, 45.

27 |     Moreover, loan originations that the complaint attributes to Citi often led to

28 | reassessments that substantially *increased* the properties' values, thereby increasing

property tax revenue.  In 2006, for instance, following the issuance of loans by Argent Mortgage Co. (for which this complaint alleges in conclusory fashion that Citi is responsible), the County Assessor increased the assessment of 3891 3rd Avenue from $110,734 to $475,000 and increased 8727 Tilden Avenue from $196,183 to $644,000. *Id.*, Exs. 40, 43.  The assessment of 8727 Tilden could have increased to a maximum of $216,602 by 2010 had the prior owner remained—$451,826 less than the assessment that resulted from the Argent loan.  Cal. Const. Art. 13A § 2(b); Pollock Dec., Ex. 43.  And although the County Assessor decreased the assessment of 8727 Tilden to $233,070 in 2011 (despite the lack of a foreclosure), that assessment is still higher than it would have been had the prior owner remained in the property.  Pollock Dec., Ex. 43.

Public records from the Department of Building Safety and the Housing and Community Investment Department, which enforce LA's housing code, similarly refute LA's assertion that it expended funds maintaining the ten properties that it identifies due to vacancies following foreclosures.  Neither department has reported any violations at four of the properties.  *Id.*, Exs. 46-49.  The only reported violations at one other property predates the alleged Citi loan.  *Id.*, Ex. 50.  And of the four properties that were foreclosed upon, one shows no violations, one shows violations only before the foreclosure, and the other two show violations only before the foreclosure and after a change in ownership—not during any period of bank ownership.  *Id.*, Exs. 47, 51-53.

## ARGUMENT

## I.    The Complaint Should Be Dismissed Because LA Lacks Standing.

To establish standing, LA must plead (1) "an 'injury in fact'"; (2) "a causal connection between the injury and the conduct complained of"; and (3) that it is "'likely' … that the injury will be 'redressed by a favorable decision.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Because LA has not satisfied its "burden" to plead all of these elements (*Chandler v. State Farm*, 598 F.3d 1115, 1122 (9th Cir. 2010)), the complaint should be dismissed under Rule 12(b)(1).

### A.     The Complaint Does Not Adequately Allege Injury.

LA must allege an injury that is "concrete and particularized" and "'actual or imminent, not conjectural or hypothetical.'"  *Lujan*, 504 U.S. at 560.  If a complaint does not allege "specific, concrete facts demonstrating that the challenged practices harm [plaintiff]," the Court may "require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing."  *Warth*, 422 U.S. at 501.

The complaint does not provide "specific, concrete facts" regarding injury.  Instead, it cites an advocacy group report asserting aggregate reductions in property tax revenue and increases in municipal services costs in LA (Compl. ¶¶ 116-19, 129), and studies finding average property value decreases associated with foreclosures in other cities.  *Id.* ¶¶ 126-27.  The complaint's only attempt to allege a specific injury simply lists ten of the 1,200 unidentified properties where LA contends that Citi-issued "discriminatory" loans "resulted in foreclosure," and states that LA "has already incurred, or will incur in the future, damages corresponding to each of these properties."  *Id.* ¶ 136.  The complaint provides no explanation of the "damages" that LA supposedly incurred at these properties.  The complaint does not even allege that the borrowers at the ten properties were minorities, how the loans were predatory, or that the alleged foreclosures resulted in vacant properties.

LA's failure to allege specific facts to support its conclusory injury assertion is particularly problematic because judicially-noticeable facts contradict its claim.  Although a "significant" reduction in property tax revenue can constitute injury (*Gladstone v. Vill. of Bellwood*, 441 U.S. 91, 110 (1979)), LA's property tax revenue *increased* every year from 1997 through 2009, decreased 5% from 2009 levels from 2010 through 2011, increased in 2012, and is projected to increase again in 2013 and 2014.  Pollock Dec., Exs. 2 at 340; 7 at 384.  As for the ten properties singled out in the complaint, six were never foreclosed upon, and one of the foreclosed properties did not decline in assessed value thereafter.  *Id.*, Exs. 26-31, 45.

1    Moreover, the premise of LA's theory—that Citi issued loans to borrowers who

2    could not repay them (Compl. ¶ 36)—refutes the notion that LA received less property

3    tax revenue than it otherwise would have.  If LA were correct, Citi's conduct would have

4    allowed *more* borrowers to buy homes, increasing LA's property tax revenue.  Indeed,

5    under LA's theory, it gained a net benefit from Citi's purported conduct, earning far

6    more property tax revenue before the recession than it "lost" thereafter.  LA's theory that

7    its residents should have paid higher property taxes also ignores the consequences of that

8    result: more foreclosures and less tax revenue.  As the LA County Assessor observed,

9    reduced assessments "often save homeowners from slipping into foreclosure and help the

10   market to correct itself more swiftly."   Pollock Dec., Ex. 1 at 2.   Beyond this,

11   foreclosures generate revenue for LA.  For example, the buyer of a foreclosed property

12   must pay a transfer tax (L.A. Mun. Code §§ 21.9.2-21.9.8) and property taxes (Cal.

13   Const. Art. 13 § 1).  LA accounts for none of this in asserting injury.

14       As for LA's asserted increase in municipal services, then-Judge Kennedy

15   explained for the Ninth Circuit that "the cost of public services for protection from fire or

16   safety hazards is to be borne by the public as a whole, not assessed against the tortfeasor

17   whose negligence creates the need for the service."  *City of Flagstaff v. Atchison, Topeka*

18   *& Santa Fe Ry. Co.*, 719 F.2d 322, 323 (9th Cir. 1983).  But even if an increased cost in

19   municipal services could constitute injury, the complaint's failure to actually identify any

20   such costs incurred on a foreclosed property for which Citi issued a "discriminatory" loan

21   violates the Supreme Court's mandate for "specific, concrete facts demonstrating" injury.

22   *Warth*, 422 U.S. at 501.

23       That failure is particularly problematic because LA's budgets show that the

24   departments that allegedly incurred additional costs—the Department of Building Safety

25   and the Police Department—have decreased their expenditures since the onset of the

26   recession and resulting increase in foreclosures.  *Supra* at 6-7.  Moreover, public records

27   for the Departments of Building Safety and Housing for the ten properties identified in

28   the complaint show that the only violations on one property occurred *before* Citi

1    allegedly owned the loans, and that some other properties have no reported violations at
2    all.  *Supra* at 8.  Nor can LA simply plead that there may be violations in the future: third
3    parties have acquired eight of the properties, and notices of default at the other two have
4    been rescinded.  *Supra* at 7.

5        Finally, even if cases allowing similar claims to proceed were correct, which they
6    are not, LA's complaint falls far short of what those courts generally have required.  In
7    *Baltimore*, the court dismissed the initial complaint for lack of standing, allowing
8    Baltimore to replead if it could allege "specific damages allegedly suffered by the City in
9    regard to specific houses" or "specific neighborhoods."  677 F. Supp. 2d at 850-51.
10   Baltimore then limited its property tax revenue claim to specified "sub-neighborhoods"
11   that were about "two blocks by two blocks" and where "Wells Fargo foreclosures …
12   constitute at least one-third of all foreclosures" (No. 08-62, Dkt. No. 176 ¶¶ 320-22), and
13   alleged property-by-property damages (*id.* ¶¶ 119-308).  For example, Baltimore pled the
14   following with respect to one house:

15       **1804 N. Carey Street:** The housing department devoted personnel time to
16           conduct one physical inspection of the property in 2006, one physical
17           inspection of the property in 2007, and an additional physical inspection of
18           the property in 2008.  The housing department incurred out-of-pocket
19           expenses to contact the owner regarding housing code violations at the
20           property.  The police department dispatched officers to the property in 2006
21           in response to a call for service.

22   *Id.* ¶ 119; *accord Memphis*, No. 09-2857, Dkt. No. 29 ¶¶ 149-98.  LA offers no remotely
23   similar allegations here and thus lacks standing.

24       **B.      The Complaint Does Not Adequately Allege Causation**.

25       Even if LA had adequately pled injury, it also must allege that the injury is "fairly
26   traceable to the challenged action of [Citi], and not the result of the independent action of
27   some third party."  *Lujan*, 504 U.S. at 560.  When "a chain of causation 'involves
28   numerous third parties' whose 'independent decisions' collectively have a 'significant

11

effect' on plaintiffs' injuries, the Supreme Court and [Ninth Circuit] have found the causal chain too weak to support standing at the pleading stage." *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011); *see*, *e.g.*, *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976).

Here, as in *Birmingham*, LA lacks standing because "a series of speculative inferences must be drawn to connect the injuries asserted with the alleged wrongful conduct."  2009 WL 8652915, at *4.  LA first asserts that Citi's purported lending discrimination caused foreclosures, resulting in vacant properties, resulting in reduced property values in the area, resulting in declining property tax revenue for LA.  That attenuated theory ignores a long list of discretionary decisions by third parties, which collectively have a significant effect on LA's property tax revenue:

• The borrower must have received a "subprime" loan because of the borrower's race.  LA must distinguish these loans from what it calls "[r]esponsible subprime" loans, which LA concedes "opened the door to homeownership to many people … who otherwise would have been denied mortgages."  Compl. ¶ 35.

• The borrower must have defaulted because of discriminatory loan terms, and the default must go uncured.  *See Maya*, 658 F.3d at 1072 (complaint alleging that nearby foreclosures caused decrease in plaintiffs' home value must show that lender's "actions *necessarily* result in foreclosure").  But as the *Birmingham* court noted, borrowers default "for a number of reasons, none of which related to [Citi's] alleged 'reverse redlining.'"  2009 WL 8652915, at *4.  "For example, the borrower may have lost a job, kept a job but did not have the wherewithal to repay in the first place, suffered a catastrophic injury, borrowed too much on credit cards, been unable to refinance the original loan, taken out a second mortgage that the borrower was unable to afford, suffered investment losses that depleted savings that were to be used to repay the mortgage, or, despite an ability to pay, simply decided to walk away from the mortgage because the expense was not justified by the property's declining value … ."  *Cleveland*, 621 F. Supp. 2d at 534.  Thus, the Ninth Circuit affirmed dismissal for lack of standing in a case alleging that defendants'

subprime lending caused foreclosures and a diminution in the value of plaintiff's nearby property. *Kaing v. Pulte Homes*, 2010 WL 625365 (N.D. Cal. Feb. 18, 2010), *aff'd*, 464 F. App'x 630 (9th Cir. 2011). As the district court explained, plaintiff's causation theory depends on "many factors, 'such as unemployment, health problems, a general weakening economy, or other financial conditions,' the decisions of various homeowners to foreclose rather than refinance, as well as other economic factors that can have unpredictable effects on the housing market." *Id.* at *6.

- The loan's owner or (where applicable) servicer must foreclose rather than modify the loan. *See Birmingham*, 2009 WL 8652915, at *4 ("decisions to foreclose" could be "for reasons totally apart from the alleged 'reverse redlining'"). Critically, the complaint suggests that third parties made that decision, alleging that Citi sells "the vast majority" of loans that it originates. Compl. ¶ 6.

- The party that bought the property at a foreclosure sale must fail to maintain or occupy the property, requiring LA to do so.

- Potential purchasers of homes near vacant foreclosed properties must decide not to buy in the area due to the vacancies rather than the host of factors that affect any decision to buy a home, such as cost, available financing, alternative housing options, commuting time, local school performance, and crime.

- The County Assessor must reduce the value of foreclosed properties due to the foreclosure rather than other factors such as the economy-induced housing slump. As noted above, however, the Assessor cannot consider foreclosure sale prices in assessing a property's value. The Assessor also must reduce the value of homes near vacant foreclosed properties due to the vacancies. But it is "speculative that the depreciation in value of the neighboring homes … was caused by the foreclosures of minority borrowers' properties rather than as a result of 'a myriad of other factors,' which … could include 'rising unemployment in the region, changes in the housing market, or other economic conditions.'" *Birmingham*, 2009 WL 8652915, at *4. LA's theory is particularly speculative because Citi-issued loans could be responsible for only a tiny portion of

13

vacancies.  The complaint alleges 200,000 foreclosures in LA from 2008-2012 (Compl. ¶ 16), and 1,200 foreclosures between 2004-2011 on Citi loans.  *Id.* ¶ 136.  Even ignoring the different time periods, which go well beyond the two-year statute of limitations, LA challenges 0.6% of foreclosures.   By contrast, LA County auctioned over 7,000 properties in the County in 2013 alone after foreclosing due to tax liens (Pollock Dec., Ex. 54), and LA's suits against Bank of America and Wells Fargo allege that they originated 2,398 and 1,447 "discriminatory" loans resulting in foreclosures. *Bank of Am.*, No. 13-9046, Dkt. 1 ¶ 195; *Wells Fargo*, No. 13-9007, Dkt. 1 ¶ 196.

- Another borrower must exist who would have bought the property and paid the property taxes.   LA's allegation that Citi originated loans "without regard to the borrower's … ability to repay" (Compl. ¶ 6) assumes that loan recipients would not otherwise have been able to finance a home purchase.  LA's theory thus also assumes that some properties would have remained vacant, generating no property tax revenue.

LA's second theory—that Citi's purported lending discrimination caused foreclosures, causing vacant properties, causing criminal activity or building code violations, causing increased costs for municipal services—is similarly attenuated.  It too requires that the borrower default and be unable to cure the default due to discriminatory terms in the loan rather than other factors, that the property would have been occupied but for the loan, that the loan's owner chose to foreclose rather than modify the loan, and that the subsequent purchaser fail to maintain the property.

LA's second theory creates yet more links in the causation chain.  The loan's owner—generally a third party (Compl. ¶ 6)—or (where applicable) servicer must fail to "maintain" the property so that it "became an eyesore, a fire hazard, or otherwise deteriorated in condition to such a degree that the City was required to incur costs either maintaining the property or demolishing it." *Cleveland*, 621 F. Supp. 2d at 534.  Here, however, neither LA's Housing nor its Building and Safety databases show any violations regarding several of the properties identified in the complaint. *Supra* at 8.  Moreover, the failure to maintain the property must result in third party "decisions to

engage in … criminal conduct." *Cleveland*, 615 F.3d at 505.  Any "causal connection" between Citi's lending practices and LA's municipal costs "is broken by the[se] intervening criminal acts." *Alston v. Advanced Brands & Importing Co.*, 494 F.3d 562, 565 (6th Cir. 2007).

## II.    The Complaint Should Be Dismissed Because It Fails To State A Claim.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility" only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Courts insist upon "'specificity in pleading' … to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope'" of success.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59 (2007).

### A.    The FHA Claim (Count I) Fails As A Matter Of Law.

#### 1.    The statute of limitations bars LA's claim.

The FHA requires that claims be filed "not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice."   42 U.S.C. § 3613(a)(1)(A).   The limitations period starts when the borrower "obtain[s]" a discriminatory loan. *Silvas v. G.E. Money Bank*, 449 F. App'x 641, 644 (9th Cir. 2011); *accord Prawoto v. PrimeLending*, 720 F. Supp. 2d 1149, 1159 (C.D. Cal. 2010).  The complaint challenges Citi's conduct "since at least 2002." Compl. ¶ 137.  LA did not sue until December 5, 2013.  The statute of limitations thus bars LA's claim insofar as it is based on loans originated before December 5, 2011.  Moreover, the ten loans identified by the complaint were all originated long before December 2011. *Supra* at 7.  Because the statute of limitations bars suit regarding the only identified loans, the FHA claim should be dismissed in its entirety.[3]

---

[3] The complaint also alleges that Citi engaged in redlining, but the FHA claim focuses solely on reverse redlining.  Compl. ¶ 139.  In any event, the complaint does not identify a single loan that Citi *ever* declined or refused to modify—before or after December 2011.

Where, as here, "the statute of limitations defense shows on the face of the complaint, the burden of alleging facts which would extend the statute falls upon the plaintiff." *Wilmshurst v. Lockyer*, 2006 WL 1409444, at *2 (E.D. Cal. May 19, 2006), *aff'd*, 295 F. App'x 205 (9th Cir. 2008). LA invokes the continuing violations doctrine, alleging that the limitations period "has not commenced to run" because Citi is purportedly engaged in a "continuous pattern or practice of mortgage discrimination." Compl. ¶ 137. The continuing violations doctrine permits plaintiffs to challenge conduct outside the limitations period if the stale conduct "'could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period.'" *Keohane v. United States*, 669 F.3d 325, 329 (D.C. Cir. 2012). "The Supreme Court has made clear … that the application of the continuing violations doctrine should be the exception, rather than the rule." *Cherosky v. Henderson*, 330 F.3d 1243, 1248 (9th Cir. 2003).

The continuing violations doctrine does not apply here because LA fails to identify any "discriminatory" loan issued (or loan modification rejected or any other purported FHA violation by Citi) "within the limitations period." *Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001). Instead, the complaint alleges only that Citi's purported practices are "continuing through the present." Compl. ¶ 137. That "conclusory" assertion, unsupported by "well-pleaded factual allegations" of specific violations committed during the limitations period, is far from enough to sustain LA's burden. *Iqbal*, 556 U.S. at 678.

Even if it had alleged specific acts of discrimination within the limitations period—which it did not—LA challenges "discrete acts" not subject to the continuing violations doctrine. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). *Morgan* "substantially limited the notion of continuing violations." *Cherosky*, 330 F.3d at 1246. The Court held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts" that occurred within the limitations period.

16

536 U.S. at 113.  It defined "discrete acts" as practices that are "separate[ly] actionable," such as "termination, failure to promote, denial of transfer, or refusal to hire."  *Id.* at 114.  The Court distinguished discrete acts from hostile work environment claims, which are typically comprised of many acts that "may not be actionable on [their] own."  *Id.* at 115.

The practices alleged here are discrete acts because a discriminatory lending decision is "separate[ly] actionable."  *Id.* at 122.  Unlike a hostile work environment claim, a decision to lend on discriminatory terms "occur[s] on a[] particular day"—the day that the loan originated.  *Id.*  The continuing violations doctrine thus cannot salvage claims based on loans originated (or modifications denied) before December 2011.  *See Silvas*, 449 F. App'x at 644 (continuing violations doctrine inapplicable "because the execution of the loan in question was a one-time act").

In an apparent attempt to evade *Morgan*, which reserved resolution of the continuing violations doctrine's applicability to pattern-or-practice claims (*id.* at 115 n.9), the complaint labels Citi's purported conduct a "pattern or practice."  Compl. ¶ 121.  Even if LA could assert a pattern-or-practice claim,[4] there are three reasons why such a claim does not advance its continuing violations argument.  First, "[t]he Supreme Court has 'stressed the need to identify with care the specific [discriminatory] practice that is at issue'" when applying the continuing violations doctrine.  *Garcia v. Brockway*, 526 F.3d 456, 462 (9th Cir. 2008).  The complaint generally refers to redlining and reverse redlining, but does not identify any specific discriminatory practice.  Moreover, the complaint asserts that Citi's practices have "change[d]" over time.  Compl. ¶¶ 5-8.  LA cannot invoke the continuing violations doctrine without identifying a continuous practice.  *See Walton v. Wells Fargo Bank*, 2013 WL 3177888, at *4 (D. Md. June 21,

---

[4] Although the Supreme Court stated in a suit where most plaintiffs sought class action status that the FHA does not limit pattern-or-practice claims to suits brought by the federal government (*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 381 n.23 (1982)), "every" circuit to consider the question has held that only the federal government or private plaintiffs seeking to represent a class may make a pattern-or-practice claim.  *Daniels v. UPS*, 701 F.3d 620, 632 (10th Cir. 2012) (Title VII).  Because LA fits neither category, it cannot use pattern-or-practice allegations to support its continuing violations theory.  *See id.* (declining to apply continuing violations doctrine based on individual private plaintiffs' pattern-or-practice claim).

2013) (continuing violations doctrine inapplicable because refusal "to grant a request for a loan modification" is "distinct from the origination of the loan and [alleged] reverse redlining").

Second, LA "cannot challenge conduct that occurred prior to the limitations period merely by alleging that the conduct was undertaken pursuant to a policy that was still in effect during the limitations period." *Cherosky*, 330 F.3d at 1248; *see Lyons v. England*, 307 F.3d 1092, 1107 (9th Cir. 2002).  To the contrary, in dismissing FHA claims as untimely, courts have declined to apply the continuing violations doctrine despite allegations that lenders engaged in a pattern-or-practice of reverse redlining when borrowers did not "alleg[e] multiple, specific, and ongoing acts of discrimination, on specific dates, as opposed to general assertions that the defendants engaged in discriminatory practices." *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 292 (S.D.N.Y. 2011); *e.g.*, *Humphrey v. Citibank, N.A.*, 2013 WL 5407195, at *3 (N.D. Miss. Sept. 25, 2013); *Federer v. Midland Mortg. Co.*, 2012 WL 5880916, at *5 (N.D. Ga. Nov. 21, 2012).  LA fails to identify a single specific discriminatory act, much less a specific date during the limitations period.

The complaint's remaining allegations focus on the alleged effects of Citi's purported conduct, not the conduct itself.  For example, LA alleges reduced property tax revenue and increased municipal services costs.  Compl. ¶ 17.  The Ninth Circuit "has repeatedly held," however, that "a 'mere continuing impact from past violations is not actionable'" under the continuing violations doctrine.  *Knox*, 260 F.3d at 1013.  LA also alleges foreclosures on Citi-issued loans, but does not allege that Citi foreclosed on a loan during the limitations period.  And LA's assertion that foreclosure is the "inevitable result" of Citi's loans (Compl. ¶ 10) makes foreclosure a mere continuing impact of past conduct.  Moreover, LA posits that third parties foreclose on "the vast majority" of Citi loans.  *Id.* ¶ 6.  But "[e]vents that occur after the statute of limitations has run and that do not involve defendants cannot … re-start the statute of limitations." *Garcia*, 526 F.3d at 463 n.5.

Third, in November 2011—outside the limitations period—LA City Councilmembers made a motion to invite a law firm to present proposed FHA litigation by LA alleging that large banks engaged in "reverse redlining" that "caused major damage to our City in lost revenues and reduced services." Pollock Dec., Ex. 14. But the continuing violations doctrine's purpose is to "permit the inclusion of acts whose character as discriminatory acts was ***not*** apparent at the time they occurred.'" *Knox*, 260 F.3d at 1014 (emphasis added). "'If an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine.'" *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1222 (11th Cir. 2001). Thus, although there may not be "'a strict notice requirement'" (*Douglas v. Cal. Dep't of Youth Auth.*, 271 F.3d 812, 824 n.13 (9th Cir. 2001)), the Ninth Circuit has found the doctrine inapplicable where (as here) plaintiffs "had notice" of their claims during the limitations period. *Knox*, 260 F.3d at 1014.

The complaint confirms that LA was on notice of its claim long ago, alleging that Citi has "a long history" of lending discrimination. Compl. ¶ 5. LA bases this allegation on "facts" that were available more than two years ago. It cites advocacy group studies and law review articles that were almost all published before December 2011. *E.g.*, *id.* ¶ 41. It cites "confidential witnesses" who allegedly were employed by Citi or its vendors, but none beyond 2011. *Id.* ¶¶ 55-63. And it cites an analysis of data from unspecified sources purportedly showing racial differences in Citi's lending between 2004 and 2011. *Id.* ¶¶ 88, 93-97. Finally, LA plainly based its complaint on the similar theories advanced in *Baltimore*, *Birmingham*, and *Memphis*—all of which were filed in 2008 or 2009.

### 2.   LA's allegations are insufficient to support an FHA claim.

Even if the FHA claim could be read to allege redlining (*but see supra* at 16 n.3), the complaint offers only generalized allegations that Citi engaged in such a practice with respect to unidentified loans taken out by unidentified borrowers. LA's failure to identify a single loan that Citi denied or declined to modify requires dismissal of any redlining

claim.  LA's reverse-redlining claim fares no better.  The complaint identifies ten purportedly "discriminatory loans" (Compl. ¶ 136), but does not allege *any* facts showing why those loans were discriminatory.  Nor does the complaint allege that the borrowers on those loans were minorities or qualified for "better" loans.  Courts have repeatedly dismissed redlining and reverse-redlining claims under similar circumstances.  *E.g.*, *Humphrey*, 2013 WL 5407195, at *5 (dismissing FHA claim alleging that Citi engaged in reverse redlining because plaintiff neither alleged that she was "a member of a protected class" nor "that she applied or was qualified for a more favorable loan") (citing cases).

Beyond this, LA bases its FHA claim on two theories: disparate treatment (Compl. ¶ 139), and disparate impact.  *Id.* ¶ 140.  Neither theory states a claim.

***LA fails to state a disparate treatment claim***.  "Proof of discriminatory motive is crucial" in asserting disparate treatment.  *Gamble v. City of Escondido*, 104 F.3d 300, 305 (9th Cir. 1997).  The complaint alleges in conclusory fashion that Citi intentionally discriminated by purportedly targeting predominantly minority neighborhoods for subprime loans.  Compl. ¶ 139.  But *Iqbal* requires dismissal if the "complaint does not contain any factual allegation sufficient to plausibly suggest [defendant's] discriminatory state of mind."  556 U.S. at 683.

Beyond conclusory allegations, the complaint tries to plead discriminatory intent principally by citing anecdotal accounts attributed to six "confidential witnesses" who purportedly worked for Citi or one of its "outsourcing companies" outside the limitations period.  Compl. ¶ 55; *see id.* ¶¶ 57, 61-62.  But these witnesses assert practices applicable to *all* borrowers, regardless of race.  *E.g.*, *id.* ¶¶ 65-68 (alleging that sales team was "financially incentivized to sell mortgages"); ¶ 71 (alleging that loan officers steered well-qualified borrowers into subprime loans to receive higher compensation); ¶¶ 73-75 (alleging that some borrowers could not refinance "stated income" loans because of heightened income verification requirements); ¶¶ 82-83, 85-86 (alleging that loan officers were pressured to generate loans and that salespeople were trained to push high interest mortgages).

The four witness statements that LA highlights at the outset of the complaint confirm its failure to plead discriminatory motive. *Id.* ¶ 12.  Three of the statements say nothing about race.  *Id.* ¶ 12(a) ("I definitely saw people with good credit scores in subprime"); ¶ 12(b) ("They [management] teach you to be very persuasive and not take no for an answer. … You try to convince them to use the equity in their home"); ¶ 12(d) ("Citi wasn't really thinking about preserving the property or keeping the people in the property. It was just foreclose, foreclose, foreclose").  And although the fourth statement mentions race (*id.* ¶ 12(c) ("'[t]hey would kick back a lot of the minorities and old people' as unqualified")), it does not allege that Citi deemed minorities "unqualified" *because of* their race.

To be sure, LA alleges that minorities were among those affected by Citi's practices (*id.* ¶¶ 76-79, 81), that some confidential witnesses believe that minorities were disproportionately affected (*id.* ¶¶ 68-70, 73, 76-77), and that foreclosures on Citi loans are disproportionately in minority areas.  *Id.* ¶¶ 99-102.  But "purposeful discrimination requires … a decisionmaker's undertaking a course of action 'because of, not merely in spite of, the action's adverse effects upon an identifiable group.'"  *Iqbal*, 556 U.S. at 676-77.  Thus, even if LA's allegations were true, they would not show that Citi *intentionally* targeted minority borrowers because of their race.  *See Woodworth v. Bank of Am.*, 2011 WL 1540358, at *19 (D. Or. Mar. 23, 2011) (dismissing reverse-redlining claim that did not "plead any facts" showing "that discriminatory animus motivated the defendants' conduct").  LA's disparate treatment claim should therefore be dismissed.

***LA fails to state a disparate impact claim***.  In *Smith v. City of Jackson*, 544 U.S. 228, 235-36 (2005), the Supreme Court recognized a disparate impact claim under an Age Discrimination in Employment Act provision barring conduct "adversely affect[ing]" protected employees, but rejected a disparate impact claim under a provision barring acts taken "because of" the employee's age.  Like the latter provision but unlike the former, the FHA bars discrimination "because of" race and does not mention effects.  42 U.S.C. §§ 3605(b), 3604(a).  Citi acknowledges that the Ninth Circuit has recognized

disparate impact claims under the FHA before and after *Smith*. *E.g.*, *Budnick v. Town of Carefree*, 518 F.3d 1109 (9th Cir. 2008).  But the Ninth Circuit has never addressed *Smith*'s impact on these claims—an issue that the Supreme Court was set to resolve before the case presenting this question settled. *Twp. of Mt. Holly v. Mt. Holly Gardens Citizens*, 133 S. Ct. 2824 (2013).  Citi submits that *Smith* precludes a disparate impact claim under the FHA.

Regardless, LA's disparate impact claim fails.  First, LA has not "isolat[ed] and indentif[ied] *specific* … practices that are allegedly responsible for any observed statistical disparities." *Smith*, 544 U.S. at 241.  Although the complaint includes a section entitled "Citi's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act" (Compl. ¶¶ 40-54), the section lacks even a single allegation about Citi.  Instead, it alleges general banking industry practices.  LA also claims to have identified 1,200 "discriminatory loans" issued by Citi that resulted in foreclosure. *Id.* ¶ 136.  But again, LA does not identify a specific Citi practice that purportedly caused any such foreclosures.

The complaint includes a conclusory allegation that Citi gives "discretion" to loan officers and "fail[s] to monitor this discretion." *Id.* ¶ 140.  But a "'policy' of allowing discretion by local" employees "'should itself raise no inference of discriminatory conduct.'" *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2554 (2011).  It is "[e]specially" important to identify the specific criterion challenged when the policy combines subjective and objective criteria. *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 994 (1988).  Far from alleging unfettered discretion (which would not be enough under *Dukes*), LA asserts that Citi's underwriting guidelines were "mostly in line with Fannie Mae guidelines" and gave underwriters only "modest" discretion to approve loans that failed those guidelines.  Compl. ¶ 60.  LA therefore cannot evade dismissal without identifying the specific aspect of discretionary decisionmaking that purportedly caused any statistical disparities.

Second, conclusory allegations aside, the complaint does not plausibly tie any *specific* Citi practice to the asserted statistical disparities.  And for reasons discussed above, LA has not plausibly alleged that Citi caused its purported injuries.  This defeats LA's disparate impact claim, even if LA had standing to assert it.  *See Garcia*, 526 F.3d at 464 (FHA requires that defendant "'cause[]'" alleged injury).

### B.      The Restitution Claim (Count II) Fails As A Matter Of Law.

LA's restitution claim fails for three independent reasons.  First, "[t]here is no freestanding cause of action for 'restitution' in California."  *Munoz v. MacMillan*, 195 Cal. App. 4th 648, 661 (2011).  Courts in this District have dismissed restitution claims for this reason.  *E.g.*, *Bitsakis v. JPMorgan Chase Bank*, 2012 WL 359283, at *3 (C.D. Cal. Feb. 1, 2012).

Second, the claim is untimely.  The FHA's two-year statute of limitations bars the restitution claim because restitution is merely a remedy under the FHA claim and thus is subject to the same limitations analysis.  *See Favila v. Katten Muchin Rosenman LLP*, 188 Cal. App. 4th 189, 223 (2010).  Alternatively, if restitution is a quasi-contract claim subject to a two-year limitations period (*see Deirmenjian v. Deutsche Bank*, 526 F. Supp. 2d 1068, 1089 n.73 (C.D. Cal. 2007)), the claim would accrue upon "discovery."  Cal. Code Civ. P. § 339(1).  For reasons discussed above (at 19-20), LA has been on notice of its claim for over two years.

Third, even if a restitution claim otherwise were viable, LA must plausibly allege that it "conferred a benefit" on Citi.  *Plumleigh v. City of Santa Ana*, 754 F. Supp. 2d 1201, 1205 (C.D. Cal. 2010).  A restitution claim fails if the "connection" between the parties is "too attenuated."  *Doe I v. Wal-Mart Stores*, 572 F.3d 677, 685 (9th Cir. 2009); *see City & Cnty. of S.F. v. Philip Morris, Inc.*, 957 F. Supp. 1130, 1144 (N.D. Cal. 1997) ("If defendants have indeed been unjustly enriched, in that their profits were increased as a result of wrongful conduct, the enrichment was at the expense of individual smokers, not of the city and counties.  Plaintiffs cite no benefit which has been conferred on defendants by plaintiffs themselves").

LA has not plausibly alleged that it conferred a benefit (directly or otherwise) on Citi. LA's alleged lost tax revenue does not benefit Citi. LA's maintenance of vacant properties might benefit Citi if Citi had foreclosed on the properties and owned them when LA incurred the expenditures. But the complaint does not allege that. To the contrary, the complaint alleges that Citi sold "the vast majority" of loans that it originated. Compl. ¶ 6. And of the four properties identified in the complaint that were foreclosed upon, none were subject to housing code violations following the foreclosure while owned by the bank. *Supra* at 8.

### C. The Punitive Damages and Injunctive Relief Requests Fail.

LA's allegations of "continuing" misconduct (*e.g.*, Compl. ¶¶ 3, 8) are merely "labels." *Twombly*, 550 U.S. at 555. LA does not allege any specific ongoing Citi activity, much less the nature of the injunctive relief sought. Its request for injunctive relief should therefore be dismissed. *See Bikle v. Doe 1-9*, 2013 WL 3878976, at *6 (C.D. Cal. July 26, 2013) (dismissing request for injunctive relief).

To recover punitive damages, LA must show "that the Defendants acted with reckless or callous indifference for the fair housing rights of others." *S. Cal. Hous. Rights Ctr. v. Krug*, 564 F. Supp. 2d 1138, 1153 (C.D. Cal. 2007). LA recites this standard (Compl. ¶ 149), but a "formulaic recitation" is insufficient. *Twombly*, 550 U.S. at 555; *see Kelley v. Corr. Corp.*, 750 F. Supp. 2d 1132, 1147 (E.D. Cal. 2010). LA does not support its conclusory recitation with allegations of concrete fact. For example, the confidential witnesses assert practices aimed at *all* borrowers, not actions taken with reckless disregard for minorities' rights.

### III. The Complaint Should Be Dismissed Because It Violates Rule 8.

A "'plaintiff suing multiple defendants must allege the basis of his claim against each defendant to satisfy [Rule] 8(a)(2)… .'" *Egbert v. Sw. Coll. Servs.*, 2013 WL 3188850, at *4 (C.D. Cal. June 21, 2013); *see McHenry v. Renne*, 84 F.3d 1172, 1179 (9th Cir. 1996). The complaint names five Citi entities as defendants, but its only defendant-specific allegations are that CitiMortgage "solicit[s] applications for making

residential mortgage loans," "Citibank owns CitiMortgage," and Citigroup owns Citibank. Compl. ¶¶ 22-25. The complaint says nothing about Citicorp Trust Bank, and Citi Holdings is not a legal entity. *See* Dkt. No. 20. With the exception of confidential witness allegations describing their anecdotal experiences working for or with CitiMortgage or Citibank, the remainder of the complaint simply lumps all five defendants together as "Citi." To make matters worse, the complaint also asserts that Citi is liable for loans originated by five non-parties and includes those non-parties in its definition of "Citi." Compl. ¶ 2 n.1. LA's failure to "differentiate[]" among Citi entities, "leaving each defendant to guess about its own allegedly unlawful conduct," requires dismissal. *McFadden v. Deutsche Bank Nat'l Trust*, 2011 WL 3606797, at *7 (E.D. Cal. Aug. 16, 2011).

Rather than plead the basis for each defendant's purported liability, LA asserts that "each of the Defendants was and is an agent of the other Defendants." Compl. ¶ 30. But LA offers no factual allegations in support of that assertion. As Judge Snyder has explained, agency may not be pled in this sort of "conclusory" fashion. *Mindlab Media v. LWRC Int'l*, 2012 WL 386695, at *4 (C.D. Cal. Feb. 6, 2012) (citing cases). LA's agency allegation therefore should be rejected.

## CONCLUSION

Citi respectfully requests that the complaint be dismissed.

Dated: February 21, 2014                    MAYER BROWN LLP


By:  /s Bronwyn F. Pollock
       Bronwyn F. Pollock

Attorneys for Defendants
CITIGROUP INC.; CITIBANK, N.A.;
CITIMORTGAGE, INC.; CITICORP
TRUST BANK, FSB; and CITI
HOLDINGS, INC.